Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/19/2019 08:07 AM CDT

State of Nebraska, appellee, v.
Nikko A. Jenkins, appellant.
___ N.W.2d ___

Filed July 19, 2019.    Nos. S-17-577, S-17-657.

1. **Courts: Trial: Mental Competency: Appeal and Error.** The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.

2. **Pleas: Appeal and Error.** A trial court is given discretion as to whether to accept a guilty or no contest plea, and an appellate court will overturn that decision only where there is an abuse of discretion.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Trial: Pleas: Mental Competency.** A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.

5. **Trial: Mental Competency.** The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.

6. **Pleas.** To support a finding that a plea of guilty or no contest has been entered freely, intelligently, voluntarily, and understandingly, a court must inform a defendant concerning (1) the nature of the charge, (2) the right to assistance of counsel, (3) the right to confront witnesses against the defendant, (4) the right to a jury trial, and (5) the privilege against self-incrimination.

7. ____. To support a plea of guilty or no contest, the record must establish that (1) there is a factual basis for the plea and (2) the defendant knew the range of penalties for the crime with which he or she is charged.

8. ____. A sufficient factual basis is a requirement for finding that a plea was entered into understandingly and voluntarily.

9. ____. A plea of no contest means that the defendant is not contesting the charge.

10. **Courts: Trial: Mental Competency.** The question of competency to represent oneself at trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.

11. **Right to Counsel: Waiver: Appeal and Error.** In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a "clearly erroneous" standard of review.

12. **Constitutional Law: Right to Counsel: Waiver.** A criminal defendant has a constitutional right to waive the assistance of counsel and conduct his or her own defense under the Sixth Amendment and Neb. Const. art. I, § 11.

13. **Trial: Right to Counsel: Waiver.** The standard for determining whether a defendant is competent to waive counsel is the same as the standard for determining whether a defendant is competent to stand trial.

14. **Right to Counsel: Waiver.** The competence that is required of a defendant seeking to waive his or her right to counsel is the competence to waive the right, not the competence to represent himself or herself.

15. **Constitutional Law: Right to Counsel: Waiver.** In order to waive the constitutional right to counsel, the waiver must be made knowingly, voluntarily, and intelligently.

16. **Right to Counsel: Waiver: Appeal and Error.** When a criminal defendant has waived the right to counsel, an appellate court reviews the record to determine whether under the totality of the circumstances, the defendant was sufficiently aware of his or her right to counsel and the possible consequences of his or her decision to forgo the aid of counsel.

17. **Criminal Law: Right to Counsel: Waiver.** A knowing and intelligent waiver of the right to counsel can be inferred from conduct, and consideration may be given to a defendant's familiarity with the criminal justice system.

18. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality of a statute presents a question of law, which an appellate court independently reviews.

19. **Constitutional Law: Statutes: Sentences.** An ex post facto law is a law which purports to apply to events that occurred before the law's

enactment and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed.

20. ____: ____: ____. There are four types of ex post facto laws: those which (1) punish as a crime an act previously committed which was innocent when done; (2) aggravate a crime, or make it greater than it was, when committed; (3) change the punishment and inflict a greater punishment than was imposed when the crime was committed; and (4) alter the legal rules of evidence such that less or different evidence is needed in order to convict the offender.

21. ____: ____: ____. The Ex Post Facto Clause bars only application of a law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.

22. **Criminal Law: Statutes: Legislature: Sentences.** Generally, when the Legislature amends a criminal statute by mitigating the punishment after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature specifically provided otherwise.

23. **Constitutional Law: Initiative and Referendum.** The constitutional provisions with respect to the right of referendum reserved to the people should be construed to make effective the powers reserved.

24. **Statutes: Initiative and Referendum.** Upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act is suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures.

25. **Constitutional Law: Sentences: Death Penalty: Mental Competency.** The Eighth Amendment forbids executing a prisoner whose mental illness makes him or her unable to reach a rational understanding of the reason for his or her execution.

26. **Constitutional Law: Sentences: Death Penalty.** U.S. Supreme Court precedent forecloses any argument that the death penalty violates the Constitution under all circumstances.

27. **Sentences: Death Penalty: Appeal and Error.** In a capital sentencing proceeding, the Nebraska Supreme Court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.

28. **Rules of Evidence: Sentences: Death Penalty.** In a capital sentencing proceeding, the Nebraska Evidence Rules shall apply to evidence relating to aggravating circumstances.

29. **Pleas: Sentences.** A no contest plea constitutes an admission of all the elements of the offenses, but not an admission to any aggravating circumstance for sentencing purposes.

30. **Sentences: Aggravating and Mitigating Circumstances: Appeal and Error.** A sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by the Nebraska Supreme Court.

31. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances: Appeal and Error.** In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.

32. **Sentences: Death Penalty: Aggravating and Mitigating Circumstances.** In a capital sentencing proceeding, a sentencer may consider as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

33. **Sentences: Aggravating and Mitigating Circumstances: Proof.** In a capital sentencing proceeding, the risk of nonproduction and nonpersuasion as to mitigating circumstances is on the defendant.

Appeals from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Nikko A. Jenkins, pro se.

Douglas J. Peterson, Attorney General, and James D. Smith for appellee.

Brian William Stull and Amy Fettig, of American Civil Liberties Union Foundation, and Amy A. Miller, of American Civil Liberties Union of Nebraska Foundation, for amici curiae National Alliance on Mental Illness et al.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Funke, JJ., and Bishop and Welch, Judges.

Cassel, J.

## I. INTRODUCTION

In consolidated appeals, one of which involved the death penalty, Nikko A. Jenkins challenges his competency to

represent himself, enter no contest pleas, proceed to sentencing, and receive the death penalty. He also makes several challenges to the death penalty. Finding no abuse of discretion by the district court and no constitutional infirmity regarding the death penalty, we affirm.

## II. BACKGROUND

We begin by setting forth a brief background. Additional facts will be discussed, as necessary, in the analysis section.

In August 2013, Jenkins shot and killed four individuals in three separate incidents in Omaha, Nebraska. In October, the State filed two criminal cases against him. In case No. CR 13-2768, the State charged Jenkins with four counts each of murder in the first degree, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person. The information contained a "Notice of Aggravators" for each count of murder. In case No. CR 13-2769, the State charged Jenkins with two counts of possession of a deadly weapon by a prohibited person. The cases were eventually consolidated. Because Jenkins remained mute at the arraignment, the court entered pleas of not guilty to all counts.

Jenkins' competency was an issue throughout the proceedings. The court held a number of hearings and received extensive evidence. In February 2014, the court found Jenkins competent to stand trial. Although psychiatrists disagreed regarding whether Jenkins was competent to stand trial and whether he was mentally ill, the court acknowledged the psychiatrists' testimony that a person can be mentally ill and still be competent to stand trial.

In March 2014, the court held a hearing during which it found that Jenkins voluntarily, knowingly, and intelligently waived his right to counsel. It granted Jenkins' motion to represent himself and appointed the public defender's office to provide an attorney to advise Jenkins. After a hearing 11 days later, the court accepted Jenkins' waiver of his right to a jury trial.

In April 2014, Jenkins ultimately entered a plea of no contest to every count. He did not agree with the factual basis provided by the State and stated that "even though [his] physical person may have been in the act of these things [he] was not in that moment because of [his] psychosis condition of psychotic mania." The court accepted Jenkins' pleas of no contest and found him guilty of the charges. Jenkins waived his right to have a jury determine whether the aggravating circumstances alleged by the State were true, stating that he would rather have a three-judge panel make that determination. The court accepted the waiver after ascertaining that it was made freely, voluntarily, and knowingly.

Approximately 1 week later, the court appointed the public defender's office to represent Jenkins in the death penalty phase. Because counsel believed Jenkins was not competent to proceed with the sentencing phase, the court held a hearing on the matter. In July 2014—approximately 4 months after finding Jenkins to be competent—the court entered an order finding that Jenkins was not competent to proceed with the sentencing phase. The court expressed concern that the two psychiatrists who believed Jenkins was competent to proceed did not believe that he had a major mental illness. The court worried that if the psychiatrists were wrong as to whether Jenkins had a major mental illness, "it places doubt as to their other opinion that [Jenkins] is competent."

After lengthy evaluation and rehabilitation efforts, the court held a status hearing in February 2015 regarding Jenkins' competency. It received a report authored by two clinical psychologists and a psychiatrist, who opined that Jenkins was competent to proceed with sentencing. In March, the court found that Jenkins was competent to proceed with the death penalty phase.

The court set the sentencing hearing before a three-judge panel to commence on July 7, 2015. However, the court postponed the hearing after the Nebraska Legislature passed a law repealing the death penalty. Through a referendum process, enough votes were gathered to stay the repeal of the death

penalty until the issue was placed on the ballot for the general election in November 2016.

Meanwhile, a psychiatrist opined in December 2015 that Jenkins was not competent. The court allowed further evaluation of Jenkins and received evidence during a June 2016 competency hearing. In September, the court found that Jenkins was competent to proceed with the sentencing phase. It subsequently rejected Jenkins' challenges to the death penalty.

In November 2016, the death penalty sentencing phase began. The three-judge panel unanimously found beyond a reasonable doubt the existence of six aggravating circumstances. It then proceeded with a hearing on mitigating circumstances. The panel received comprehensive evidence regarding, among other things, Jenkins' mental health and his time in solitary confinement.

In May 2017, the three-judge panel entered a 30-page sentencing order. The panel found no statutory mitigators existed. The panel found two nonstatutory mitigators to be considered in the weighing process: Jenkins' bad childhood and his mental health—that he had "a personality disorder of narcissistic, antisocial, and borderline."

The panel unanimously determined that the mitigating circumstances did not approach or exceed the weight given to the aggravating circumstances. With regard to proportionality in comparison with other cases around the state, the panel stated that Jenkins' "commission of these four murders over a ten day period is one of the worst killing sprees in the history of this state." Thus, the panel found that sentences of death were not excessive or disproportionate to the penalty imposed in similar cases.

The panel imposed a sentence of death for each of the four counts of murder in the first degree. It imposed consecutive sentences of 45 to 50 years' imprisonment on all other counts. Because the sentences involved capital punishment, this automatic appeal followed.[1]

---

[1] See Neb. Rev. Stat. § 29-2525 (Cum. Supp. 2018).

### III. ASSIGNMENTS OF ERROR

Jenkins claims that the district court erred in accepting his pleas of no contest for two primary reasons: (1) He was not competent to enter them and (2) they lacked a factual basis or affirmative evidence of a valid waiver of trial rights.

He assigns that the court erred in finding him to be competent to proceed pro se and that his convictions and his sentences are constitutionally infirm, because they were the product of the trial court's erroneous determination that he was competent to proceed to trial and sentencing.

Jenkins makes several challenges concerning the death penalty. He assigns that the court erred in denying his motion to preclude the death penalty as a violation of the ex post facto prohibitions and in denying his motion to find Nebraska's statutory death penalty sentencing procedure is unconstitutional. Jenkins claims that the death penalty is cruel and unusual punishment when imposed upon seriously mentally ill offenders and individuals with intellectual disability. He further assigns that the death penalty in all cases violates the Eighth Amendment to the U.S. Constitution and Neb. Const. art. I, § 9.

Jenkins also alleges that the sentencing panel committed error. He assigns that the panel erred by sentencing him to death based on facts alleged during the plea proceeding. He also assigns that the panel erred by failing to give meaningful consideration to his mental illness, his unfulfilled requests for commitment before the crime, and the debilitating impact of solitary confinement.

Additionally, Jenkins filed a pro se brief. He argued that his counsel was ineffective by failing to bring Jenkins' attempted suicide to the attention of the court when it was contemplating Jenkins' competency. However, Jenkins failed to assign any error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[2] Although we decline

---

[2] *State v. Dill*, 300 Neb. 344, 913 N.W.2d 470 (2018).

to resolve this alleged error, we note that during a hearing on competency, Jenkins' counsel asked one of the State's experts about Jenkins' suicide attempts and one of Jenkins' experts also discussed those attempts.

## IV. ANALYSIS

### 1. Acceptance of Pleas

Jenkins contends that the court abused its discretion in accepting his no contest pleas for a variety of reasons. He claims that he was not competent to enter pleas. In the same vein, he alleges that there was no affirmative evidence of a knowing, voluntary, and intelligent waiver of trial rights. Jenkins also argues that no factual basis existed for the pleas.

### (a) Standard of Review

[1] The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[3]

[2,3] A trial court is given discretion as to whether to accept a guilty or no contest plea, and an appellate court will overturn that decision only where there is an abuse of discretion.[4] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[5]

### (b) Additional Background

#### (i) Competency

During a November 2013 hearing, the court received Dr. Bruce D. Gutnik's November 8 psychiatric diagnostic competence evaluation. Gutnik opined that Jenkins suffered

---

[3] *State v. Fox*, 282 Neb. 957, 806 N.W.2d 883 (2011).

[4] See *State v. Clemens*, 300 Neb. 601, 915 N.W.2d 550 (2018).

[5] *Id.*

from "Schizophrenia, Continuous, Severe." Gutnik noted that Jenkins had hallucinations and delusions and "blunted affect." Gutnik could not rule out "Schizoaffective or Other Specified Personality Disorder." Gutnik opined that Jenkins was not competent to stand trial, but that Jenkins' competence could be restored with appropriate treatment, including antipsychotic medications. The court ordered that Jenkins be evaluated for competence to stand trial by staff at the Lincoln Regional Center.

In February 2014, the court held a competency hearing. Psychiatrist Y. Scott Moore opined that Jenkins was competent for trial. He based that determination on Jenkins' ability to understand three prongs: (1) awareness of the charges against him, (2) understanding of legal procedures and the functions of the people in the courtroom, and (3) ability to make a rational defense. Moore believed that Jenkins' primary diagnosis was antisocial personality disorder, that there was a "very slim" likelihood of Jenkins' having any other psychotic illness, and that Jenkins was mostly malingering.

Other evidence pointed to the contrary. Dr. Eugene C. Oliveto performed a mental health evaluation on Jenkins 2 days prior to the hearing and arrived at an "Axis I" diagnosis of schizophrenia and posttraumatic stress disorder. In 2009, Dr. Natalie Baker had opined that Jenkins had psychosis not otherwise specified and bipolar disorder—an opinion which Gutnik noted during the 2014 competency hearing. According to Gutnik, hallucinations and delusions are the two primary signs of psychosis and a review of Jenkins' records showed a history of hallucinations dating back to age 8. Thus, Gutnik testified that if Jenkins was malingering, he had been doing so since he was 8.

On February 20, 2014, the court found Jenkins competent to stand trial.

### (ii) Plea Hearing

In April 2014, the court held a hearing on Jenkins' pro se motion to plead guilty to all felony counts. Several times

during the hearing, Jenkins changed how he wished to plead. He ultimately entered no contest pleas to all charges.

Initially, Jenkins entered a guilty plea to each charge in case No. CR 13-2768 and a not guilty plea to both charges in case No. CR 13-2769. The court then advised Jenkins of the litany of constitutional rights he was giving up by entering guilty pleas. Jenkins interjected to ask whether the not guilty pleas would hinder anything, because he did not want "to be sitting in, you know, Douglas County, you know, eight months, 23-hour-a-day confinement, when I ain't did nothing." The court advised that a trial would be held on those charges. Jenkins stated that he understood the constitutional rights he would be waiving. He followed that by stating he had already filed a habeas corpus action in federal court.

The court recited the elements for all of the charges and advised Jenkins as to the penalties. Upon Jenkins' request, the court allowed him to plead no contest to the weapons charges in both cases. Before the court accepted those pleas, Jenkins stated that he wished to submit crime scene photographs for the record.

When the court asked if the pleas of guilty and no contest were Jenkins' free and voluntary acts, Jenkins answered that they were voluntary but not free. He believed that judicial officers had been unethical and had violated his rights and that he saw "no other choice but to take these matters to another jurisdiction." The court then asked, "Are you freely, knowingly and voluntarily entering these pleas of guilty and no contest?" Jenkins answered, "Yes." Jenkins also stated that he understood he was giving up constitutional rights and waiving any motions pending now or in the future.

The court asked for a factual basis for all charges, and the prosecutor supplied a lengthy recitation. The prosecutor stated that on August 11, 2013, police were called to a location in Omaha, Nebraska, and found the bodies of Jorge Cajiga-Ruiz and Juan Uribe-Pena deceased in a pickup truck with their pockets "kind of turned inside out in their pants." The investigation revealed that the victims were lured by Jenkins' sister

and cousin under the premise of performing acts of prostitution. Jenkins interjected, "I know you were gonna lie like this." The prosecutor stated that Jenkins shot the victims in the head with a shotgun loaded with a "deer slug." The victims were robbed with their billfolds taken. An autopsy showed that Cajiga-Ruiz died of a single gunshot wound to the head, which first passed through his right hand, and that Uribe-Pena died of a single gunshot wound to the head or face.

The prosecutor stated that on August 19, 2013, the police were called to "18th and Clark Streets" and observed Curtis Bradford with "obvious gunshot wounds to the head." Police found a deer slug, consistent with the deer slug used at the earlier homicides. The autopsy showed that Bradford had two gunshot wounds to the head and that the entrance was the back of the head. The prosecutor continued:

> In the course of the investigation by the Omaha Police Department, there were witnesses. A witness who was in a vehicle with . . . Jenkins[] and his sister . . . who had — was upset with . . . Bradford, apparently.
>
> MR. JENKINS: He's lying. Liar.
>
> [Prosecutor]: They set up that they were going to do — perform some sort of another act of either a robbery or a burglary, some kind of a jacking. They picked up . . . Bradford. He had gloves on, was dressed in a dark outfit. They let him hold a .9 millimeter Hi-Point Carbine rifle as they went to this location. Once they got to a location where he was murdered, at 1804 North 18th Street, [Jenkins' sister] shot him once in the head. And then . . . Jenkins said, this is how you do it, and — and proceeded to use a shotgun with a deer slug —
>
> MR. JENKINS: Liar.
>
> [Prosecutor]: — and shot . . . Bradford in the head also.
>
> MR. JENKINS: Fucking liar.

The prosecutor stated that on August 21, 2013, as Andrea Kruger was driving home from work at approximately 1:30 or 2 a.m., she was stopped at "168th and Fort Street" by a vehicle occupied by Jenkins, his uncle, his sister, and his

cousin. Jenkins got out of his vehicle and pulled Kruger from her vehicle, because he wanted her sport utility vehicle to "rob or jack other people." After Jenkins shot Kruger several times, he and his uncle took her vehicle. An autopsy showed that Kruger's cause of death was gunshot wounds to the head, neck, and back.

According to the prosecutor, police obtained a search warrant for a bag that Jenkins carried into an apartment. The bag contained a "Remington Model Express Magnum Pump 12-gauge shotgun with a cut barrel and butt stock and a Hi-Point Carbine Model 995 rifle." Spent shell casings recovered from the Kruger murder scene were determined to have been fired by the Hi-Point carbine that was found in the bag. That same carbine had Bradford's DNA on it. Ballistics evidence showed that the spent rifle slug from the Bradford crime scene was fired from the shotgun recovered from the bag. During an interview with Omaha police officers, Jenkins said he fired the weapons and killed the four victims. Police also obtained video from businesses located at 168th and Fort Streets which showed Jenkins and his uncle in the area around the time of Kruger's murder. Further corroboration came from Jenkins' cousin, who was present at the first and last murders, and from one of Jenkins' sisters concerning Bradford's murder. For purposes of the factual basis, the court received a certified copy of a felony conviction for Jenkins.

Jenkins disputed the accuracy of the factual basis. He explained that while his "physical person may have been in the act of these things [he] was not in that moment because of [his] psychosis condition of psychotic mania . . . and manic episode that [he] was within." Jenkins stated that he heard the voice of "Apophis" prior to the crimes. The court inquired whether Jenkins understood that entry of a guilty plea waived the right to enter a plea of not guilty by reason of insanity. Jenkins responded that he understood. He asserted that Apophis ordered him to sacrifice the victims. The court asked if Jenkins purposely and with deliberate and premeditated malice killed Cajiga-Ruiz. Jenkins answered: "[T]he last thing I could

remember was I'm in a car. The next thing I know I'm in front of this truck and I'm in front of these individuals. It wasn't premeditated. The demonic force led me to them just like to the other victims." He stated, "I don't recall in the moment of shooting them." Similarly, when asked if he remembered killing Bradford, Jenkins answered that he remembered being with Bradford and hearing Apophis. With regard to Kruger's murder, Jenkins recalled seeing a vehicle pull up behind his, hearing Apophis, and getting out of his vehicle.

The court expressed concern about accepting the guilty pleas due to Jenkins' disagreement with the factual basis. The court stated that it would accept a no contest plea to all of the charges, to which Jenkins agreed. After Jenkins entered pleas of no contest to all counts, he then asked if the court was going to accept crime scene photographs for purpose of his appeals. The court advised that it did not need to receive any evidence at that time. It then accepted the factual basis by the State and found Jenkins guilty of the charges.

### (c) Discussion

### (i) Competency

[4,5] The first hurdle is whether Jenkins was competent to plead no contest. A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.[6] The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.[7]

---

[6] *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018), *disapproved on other grounds, State v. Allen*, 301 Neb. 560, 919 N.W.2d 500.

[7] See *State v. Fox, supra* note 3.

In finding Jenkins competent, the court considered the evidence received at the competency hearing along with its colloquy with Jenkins during that hearing. Although the experts disagreed, there was expert testimony that Jenkins was competent. The court reasoned that its colloquy with Jenkins showed that he could "comprehend his rights, convey his reasons why he believed his rights had and were being violated, and to follow the request of the Court as to the timeliness of submitting his grievances."

The court's interactions with Jenkins are important. At the time of the court's competency determination, it had observed Jenkins on a number of occasions. The U.S. Supreme Court has recognized that "the trial judge, particularly one . . . who presided over [a defendant's] competency hearings . . . , will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."[8]

Here, the court based its competency determination on expert testimony and its own discussion with Jenkins. Sufficient evidence supports the court's determination of competency; therefore, we will not disturb it.

### (ii) Validity of Pleas

[6,7] In considering the validity of Jenkins' pleas, we recall well-known principles. A plea of no contest is equivalent to a plea of guilty.[9] To support a finding that a plea of guilty or no contest has been entered freely, intelligently, voluntarily, and understandingly, a court must inform a defendant concerning (1) the nature of the charge, (2) the right to assistance of counsel, (3) the right to confront witnesses against the defendant, (4) the right to a jury trial, and (5) the privilege against self-incrimination.[10] To support a plea of guilty or no contest, the

---

[8] *Indiana v. Edwards*, 554 U.S. 164, 177, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008).

[9] *State v. Wilkinson*, 293 Neb. 876, 881 N.W.2d 850 (2016).

[10] See *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

record must establish that (1) there is a factual basis for the plea and (2) the defendant knew the range of penalties for the crime with which he or she is charged.[11]

[8,9] A sufficient factual basis is a requirement for finding that a plea was entered into understandingly and voluntarily.[12] Jenkins contends that his pleas lacked a factual basis, because he disagreed with the prosecutor's version of the facts. But a plea of no contest does not admit the allegations of the charge; instead, it merely declares that the defendant does not choose to defend.[13] Such a plea means that the defendant is not contesting the *charge*.[14] We find no requirement that a defendant agree with the factual basis. If the State presents sufficient facts to support the elements of the crime charged and the defendant chooses not to defend the charge, no more is required. We conclude that the State supplied a sufficient factual basis.

Jenkins' other challenges to his pleas are likewise unpersuasive. He argues that the record demonstrated he did not make a knowing, voluntary, and intelligent waiver of his rights. He further contends that his pleas were the product of psychologically coercive conditions of solitary confinement.

The record supports a finding that Jenkins entered valid pleas. The bill of exceptions shows that the court informed Jenkins of the rights he would be waiving by entering a guilty or no contest plea and that Jenkins responded he understood. We agree that some of Jenkins' statements can be read to show confusion. But the court, having interacted with Jenkins on numerous occasions by the time of the plea hearing, was in the best position to assess the validity of his waiver of trial rights. Further, the court held a competency hearing before accepting Jenkins' pleas and, with the benefit

---

[11] *State v. Wilkinson, supra* note 9.

[12] *Id.*

[13] See 21 Am. Jur. 2d *Criminal Law* § 645 (2016).

[14] See *In re Interest of Verle O.*, 13 Neb. App. 256, 691 N.W.2d 177 (2005).

of expert evidence, found Jenkins competent. We cannot say that the court abused its discretion in accepting Jenkins' pleas of no contest.

## 2. Waiver of Counsel

Jenkins claims that the court committed reversible error when it allowed him to proceed pro se. He contends that the court failed to adequately advise him of the pitfalls of pro se representation.

### (a) Standard of Review

[10] The question of competency to represent oneself at trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[15]

[11] In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a "clearly erroneous" standard of review.[16]

### (b) Additional Background

Less than 1 month after the court found Jenkins competent to stand trial, it held a hearing on Jenkins' request to dismiss his counsel and to proceed pro se. The court told Jenkins that the charges he faced were "extremely serious," that representing himself would be "extremely difficult," that Jenkins' counsel was "probably one of the best defense attorneys in this entire area," and that Jenkins was "placing [his] defense at risk" if he did not want counsel to represent him.

The court found that Jenkins voluntarily, knowingly, and intelligently waived his right to counsel. It granted Jenkins' motion to represent himself and appointed the public defender's office to provide an attorney to advise Jenkins.

---

[15] *State v. Lewis*, 280 Neb. 246, 785 N.W.2d 834 (2010).

[16] *State v. Hessler*, 274 Neb. 478, 741 N.W.2d 406 (2007).

## (c) Discussion

[12] A criminal defendant has a constitutional right to waive the assistance of counsel and conduct his or her own defense under the Sixth Amendment and Neb. Const. art. I, § 11.[17] However, a criminal defendant's right to conduct his or her own defense is not violated when the court determines that a defendant competent to stand trial nevertheless suffers from severe mental illness to the point where he or she is not competent to conduct trial proceedings without counsel.[18] The two-part inquiry into whether a court should accept a defendant's waiver of counsel is, first, a determination that the defendant is competent to waive counsel and, second, a determination that the waiver is knowing, intelligent, and voluntary.[19]

### (i) Competency

[13] The standard for determining whether a defendant is competent to waive counsel is the same as the standard for determining whether a defendant is competent to stand trial.[20] Here, the court accepted Jenkins' waiver of counsel less than 1 month after finding that Jenkins was competent to stand trial— a determination that we have concluded was supported by sufficient evidence. And unlike in *State v. Lewis*,[21] where the record showed that the defendant suffered from severe mental illness, the court here did not find that Jenkins was impaired by a serious mental illness or lacked mental competency to conduct trial proceedings by himself.

[14] We are mindful that the competency question is not whether a defendant can ably represent himself or herself. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*,

---

[17] *State v. Ely*, 295 Neb. 607, 889 N.W.2d 377 (2017).

[18] *State v. Lewis, supra* note 15.

[19] See *State v. Hessler, supra* note 16.

[20] *Id.*

[21] *State v. Lewis, supra* note 15.

not the competence to represent himself."[22] Indeed, "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation."[23] The court recognized during the hearing that it had declared Jenkins competent to stand trial, and sufficient evidence supports that finding. Thus, Jenkins was also competent to waive his right to counsel.

### (ii) Validity of Waiver

[15,16] In order to waive the constitutional right to counsel, the waiver must be made knowingly, voluntarily, and intelligently.[24] When a criminal defendant has waived the right to counsel, this court reviews the record to determine whether under the totality of the circumstances, the defendant was sufficiently aware of his or her right to counsel and the possible consequences of his or her decision to forgo the aid of counsel.[25] Formal warnings do not have to be given by the trial court to establish a knowing, voluntary, and intelligent waiver of the right to counsel.[26] In other words, a formalistic litany is not required to show such a waiver was knowingly and intelligently made.[27]

Jenkins' waiver of counsel was voluntary. Like in *State v. Dunster*,[28] no promises or threats were made to encourage the waiver of the right to counsel and the defendant prepared his own written motion to discharge counsel. Moreover, the decision to discharge counsel and proceed pro se was not forced upon Jenkins; rather, Jenkins wished to handle matters

---

[22] *Godinez v. Moran*, 509 U.S. 389, 399, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (emphasis in original).

[23] *Id.*, 509 U.S. at 400 (emphasis in original).

[24] *State v. Ely, supra* note 17.

[25] *State v. Hessler, supra* note 16.

[26] *State v. Figeroa*, 278 Neb. 98, 767 N.W.2d 775 (2009), *overruled in part on other grounds, State v. Thalken*, 299 Neb. 857, 911 N.W.2d 562 (2018).

[27] *Id.*

[28] *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001).

in a particular way and was dissatisfied with his counsel's failure to file certain motions that counsel believed to be frivolous.

[17] The record shows that Jenkins knowingly and intelligently waived his right to counsel. A knowing and intelligent waiver can be inferred from conduct, and consideration may be given to a defendant's familiarity with the criminal justice system.[29] Jenkins, as a convicted felon at the time of the instant charges, had prior involvement with the criminal justice system. And counsel represented Jenkins in proceedings leading up to the hearing on Jenkins' motion to discharge counsel. The fact that Jenkins was represented during earlier proceedings indicates that he was aware of his right to counsel and that he knew what he would forgo if he waived counsel.[30] The court warned Jenkins that it would be difficult to represent himself. But a waiver of counsel need not be prudent, just knowing and intelligent.[31]

The court's determination that Jenkins' waiver of counsel was voluntary, knowing, and intelligent was not clearly erroneous. Jenkins knew that he had the right to legal counsel and that he faced potential sentences of death. Further, the court appointed Jenkins' prior counsel to provide advice.

### 3. Competency to Proceed to Sentencing

Jenkins claims that his convictions and sentences are constitutionally infirm as the product of the trial court's erroneous determination that he was competent to proceed to trial and sentencing.

### (a) Standard of Review

The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's

---

[29] See *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

[30] See *State v. Hessler, supra* note 16.

[31] *State v. Ely, supra* note 17.

determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[32]

### (b) Additional Background

Above, we summarized evidence as to Jenkins' competency prior to entry of his pleas. The court also held several postplea competency hearings, which we discuss next.

### (i) July 2014

In July 2014, the court held a hearing on Jenkins' competency to proceed with the death penalty phase. Gutnik, who evaluated Jenkins on four occasions over a number of years, testified that he looks at consistency over time in determining whether a person is accurately relating auditory and visual hallucinations. Gutnik testified that Jenkins consistently spoke about seeing various Egyptian gods and about hearing the voice of an Egyptian god. Gutnik stated that records from psychiatrists when Jenkins was 8 years old mentioned auditory and visual hallucinations. Gutnik noted that symptoms had been reported on multiple occasions unrelated to legal issues, and he questioned what a person's motivation would be to say he or she was hearing things when there was no secondary gain involved. Gutnik observed that Jenkins had a long history of self-mutilation, some of it having to do with delusional beliefs about emissaries from Egyptian folklore and some of it coming from his mood swings.

Gutnik opined that Jenkins was incompetent to "stand trial." Although Jenkins understood that he had an attorney and that a judge would be present during the death penalty phase, Gutnik testified that Jenkins did not understand that he had been convicted. Gutnik did not believe that Jenkins had "the ability to meet the stress of a real trial without his rationality or judgment breaking down." Gutnik testified that Jenkins could "probably" be restored to competency, but that he would need to be in a hospital and treated with medications.

---

[32] *State v. Fox, supra* note 3.

Dr. Jane Dahlke, a psychiatrist who evaluated Jenkins when he was 8 years old, testified that he was hospitalized for 11 days. Jenkins' mother brought him to the hospital due to statements of self-harm and increasing aggression toward others. Dahlke diagnosed him with oppositional defiant disorder and attention deficit hyperactive disorder. At that time, the field of psychiatry was not diagnosing 8-year-old children with bipolar disorder. But based on the records of her observations, Dahlke now would have diagnosed Jenkins with some form of childhood bipolar disorder. She noted in her records that Jenkins talked about hearing voices that would tell him to steal and had nightmares about his father shooting his mother. He reported auditory hallucinations and seeing "black spirits." Because Dahlke did not see any reason for Jenkins to feign mental illness or to have any secondary gain for doing so, she felt that Jenkins was experiencing what he reported.

Moore differed, testifying that he believed Jenkins was competent to proceed to sentencing. He had evaluated Jenkins three times, most recently a month earlier. In Moore's experience with schizophrenics, those hearing voices "block off" and/or "look to the side" and are unable to continue giving attention to Moore. But Jenkins differed; he said he heard voices all of the time, and at no point during the evaluation was Jenkins distracted. Moore thought that all the symptoms Jenkins reported were fabricated. Moore believed that Jenkins had been malingering all along, including when he was 8 years old, and using fanciful stories to try to explain his behavior and not be held accountable for it. Moore opined that a person can be psychotic and competent at the same time. He explained: "A person who is psychotic can understand all of the procedures against him. He may disagree with them, but he understands them and can work up a defense with his attorney."

Baker first encountered Jenkins in 2009 and last saw him in February 2013. She did not examine Jenkins for the purpose of determining whether he was competent. She noted psychotic symptoms, such as Jenkins' reports of being paranoid and of auditory hallucinations where he heard a voice that he called

Apophis. In a December 2009 note, Baker stated that Jenkins appeared to be attempting to use mental health symptoms for secondary gain, including to avoid legal consequences in court for recent behaviors. Baker opined in February 2013 that Jenkins appeared to be mentally ill and was an imminent danger to others.

Dr. Klaus Hartmann, a forensic psychiatrist, first met Jenkins during a June 2014 evaluation. He opined that Jenkins was competent to proceed to sentencing. Hartmann did not believe that Jenkins had a major mental disorder; rather, Hartmann felt that Jenkins had a personality disorder which accounted for his symptoms.

Hartmann also thought that many of Jenkins' symptoms appeared contrived. He testified that they were "a caricature of mental illness rather than a real mental illness," that Jenkins overelaborated, and that Jenkins "produces additional symptoms that just simply are not in keeping with my experience." Hartmann found it unusual that Jenkins "parades his mental illness," when most people with mental illness do not come forward to say they are sick. According to Hartmann, most people who are psychotic do not understand that they are psychotic, which is part of having lost touch with reality. He remarked that although Jenkins would say he had no memory of events, in further questioning, Jenkins understood and remembered clearly some of the matters.

Dr. Martin W. Wetzel saw Jenkins for a psychiatric consultation in March 2013. According to his report, Jenkins expressed bizarre auditory hallucinations that "did not appear to be consistent with typical symptoms of a psychotic disorder." Wetzel's assessment was "Bipolar Disorder NOS, Probable"; "PTSD, Probable"; "Antisocial and Narcissistic PD Traits"; and "Polysubstance Dependence in a Controlled Environment." The report stated: "The patient has an unusual list of demands, the first of which has been placement in a psychiatric hospital. This could be related to a singular motive or a combination of motives, including malingering and/or a sense of disease."

Following the July 2014 hearing, the court found that Jenkins was not competent to proceed with sentencing.

*(ii) February and March 2015*

In February 2015, the court held a status hearing regarding Jenkins' competency. Jenkins informed the court that he had been stable the past 6 months and was competent to proceed.

The court received a 31-page report submitted by Jennifer Cimpl Bohn, a clinical psychologist; Rajeev Chaturvedi, a psychiatrist; and Mario J. Scalora, a consulting clinical psychologist. The report detailed observations from Lincoln Regional Center sessions and a discussion of current competency-related abilities. They opined that Jenkins was competent to proceed with sentencing, that he demonstrated an adequate factual understanding of the proceedings, and that he demonstrated the ability to rationally apply such knowledge to his own case. Their diagnosis was "Other Specified Personality Disorder (e.g., Mixed Personality Features - Antisocial, Narcissistic, and Borderline)," malingering, polysubstance dependence, and a history of posttraumatic stress disorder.

The report contained extensive background information. It included a discussion that Jenkins' hearing voices at a young age may have actually been the voices of children with Jenkins and that his sleeping difficulties and nightmares related to violent events he had witnessed. The report noted that a February 2012 record from a "Mental Illness Review Team" indicated that Jenkins "referred to his presentation of symptoms as a 'skit' in conversations with his mother and girlfriend." A record 2 months later revealed that after Jenkins broke a fire suppression sprinkler and flooded a section of the unit, staff reported that Jenkins said "'he would continue to act insane until he got the mental health treatment he was entitled to'" and that actions such as breaking sprinkler heads and smearing feces "'would get immediate response[s] from mental health. He stated he was a smart man and knew how to get the responses from mental health so he could get the treatment he needed.'" The report contrasted

letters written by Jenkins on the same day in 2012: Several of the letters were written in a pyramid design, with comments about schizophrenia and Egyptian gods and goddesses, and the need for emergency hearings; whereas a different letter was written in typical form with a clear request for a copy of Jenkins' records.

The report documented instances in which Jenkins appeared to use symptoms of mental illness for secondary gain. In January 2013, Jenkins obtained access to restricted property after he stated that Apophis wanted him to harm himself. After cutting himself, Jenkins refused to have sutures removed if his restrictive status was not decreased. According to a mental health contact note, Jenkins said he "could ignore Apophis if allowed access to ear buds or paper in his room." In February, Jenkins broke another fire suppression sprinkler in his room and staff reported that Jenkins said he was hearing voices and would break another sprinkler head if put back in the same cell.

According to the report, a psychiatrist indicated in April 2013 that Jenkins "appeared to be 'performing.'" The psychiatrist mentioned that Jenkins told his mother he "was 'going to try to get a psychiatric diagnosis so he could get paid,' seemingly in reference to obtaining disability benefits." That psychiatrist diagnosed Jenkins with "'Antisocial Personality with narcissistic features vs. Narcissistic Personality with antisocial features.'"

The report noted that Jenkins had requested on numerous occasions to be diagnosed with schizoaffective disorder. When challenged that such requests suggested that Jenkins was "more interested in the prescription and diagnosis being documented, as opposed to actually receiving treatment for mental health problems," Jenkins "generally changed the topic or grinned and remained silent." According to the report, Jenkins had remarked that asking for certain medications in the past "resulted in him obtaining diagnoses that he perceives as favorable for his legal strategies."

The report stated that Jenkins had an "inflated view of himself consistent with narcissistic traits." It elaborated:

Jenkins repeatedly made statements about being a "mastermind," "strategist," "chess player," and engaging in "psychological warfare," in reference to the legal proceedings and his assertions that he will be able to have governmental agencies held liable for his actions by stating certain things (e.g., that he needs treatment in a different placement), obtaining a documentation trail, and then exhibiting certain behaviors (e.g., self-harm). When describing his actions to have others held liable for his actions, he demonstrated significant forethought, outlining how he strategizes to achieve his goals, and that the fruits of his labor have been realized by [the Department of Correctional Services'] being criticized for their actions.

Jenkins also made repeated comments about not wanting to be found competent. The report explained:

He described how it was his intent to be found competent for trial because he wanted to enter a guilty plea so he would have grounds to appeal later on, but wanted to be found incompetent after the conviction, and as a result, behaved in such a way to achieve that goal. In a similar manner, . . . Jenkins repeatedly highlighted how being diagnosed with a mental illness by Drs. Baker, Oliveto, and Gutnik has benefitted him, and sought to pressure [Lincoln Regional Center] personnel into providing a similar diagnosis by stating that those were "medical doctors" with many years of experience. While he repeatedly asserted suffering from "severe" mental illness, . . . Jenkins never appeared bothered by the symptoms. At times, [he] became confrontational and intimidating. There was no indication of psychotic process throughout these discussions, and he sporadically, almost as an afterthought, would assert that he heard auditory hallucinations and suffered from delusions (e.g.,

reference to returning to his cell to "bask in [his] insanities," or that he would go to his cell to converse with "the spiritual realm").

In August 2014, Jenkins was administered a test to assess his self-report of symptoms. The results showed "a pattern of markedly elevated sub-scores that is strongly characteristic of an individual feigning a mental disorder." The test contained eight primary scales, and Jenkins' scores were in the "definite feigning range" on four scales, in the "probable feigning range" on three scales, and in the "indeterminate range" on one scale.

The report stated that Jenkins had been inconsistent in his report of psychotic symptoms. Although records suggested that Jenkins reported hallucinatory experiences as a child, providers at the facility where Jenkins was hospitalized "characterized those symptoms as reactions to traumatic experiences (i.e., nightmares) or real experiences (i.e., older boys who instructed him to steal)." According to the report, "The lack of further report of such symptoms until over a decade later provides credence to that initial conceptualization of those symptoms." The report stated that Jenkins' self-report as an adult "has been inconsistent over time, with the exception of a common theme of hearing the voices of Apophis and other gods/demons in the last few years." The report provided several reasons, which we do not detail here, why Jenkins' assertions that he "always" heard those voices since childhood lacked credibility.

In March 2015, the court found that Jenkins was competent to proceed with the death penalty phase.

### (iii) December 2015

In December 2015, shortly after Gutnik evaluated Jenkins and opined that he was not competent, the court held a hearing. Gutnik believed that Jenkins was deteriorating over time due to being kept in isolation. Upon the State's motion, the court stated that it would allow doctors from the Lincoln Regional Center to evaluate Jenkins.

### (iv) June 2016

The court next held a competency hearing in June 2016. By that time, Cimpl Bohn, Chaturvedi, and Scalora had jointly evaluated Jenkins beginning in January 2016 and continuing until their report was authored on May 10. The team saw Jenkins once in January, March, and April.

Cimpl Bohn opined that Jenkins had "a significant severe personality disorder marked by antisocial, narcissistic and borderline traits." She believed that Jenkins was malingering other psychiatric symptoms. Cimpl Bohn testified that Jenkins' presentation of psychotic symptoms and his self-report of such symptoms was not validated by behavioral observations or record review. With regard to malingering, Cimpl Bohn testified that Jenkins' self-harming clearly had a secondary gain component. And psychological testing helped confirm the malingering diagnosis. Cimpl Bohn testified that a person can have a mental illness and still be malingering, but she felt that Jenkins suffered from a severe personality disorder and not from a psychotic disorder or a major affective mood disorder.

Cimpl Bohn testified that in "short bursts," Gutnik could have mistaken Jenkins' bizarre and dramatic behavior for a type of mental illness. She felt that the psychiatrist who offered a diagnosis of schizoaffective disorder in July 2015 "seemed to be struck by some of the dramatic nature of . . . Jenkins' statements about auditory hallucinations." She noted that the psychiatrist's record reflected that Jenkins' thought process was organized and logical, that his speech was generally normal and understandable, and that he was coherent. Cimpl Bohn testified that if the diagnosis was schizoaffective disorder or schizophrenia, one would expect to see some disorganization of the thought process and not just reported hallucinations or delusions. She noted that the psychiatrist's notes raised concerns about malingering or secondary gain and suspicion that Jenkins was self-harming to get out of segregation.

Cimpl Bohn opined that Jenkins was competent to proceed. In making that determination, she considered whether Jenkins

possessed a factual understanding of the legal system and legal proceedings, an ability to apply that to the individual's own case, and a rational ability to consult with counsel. Cimpl Bohn felt that Jenkins would struggle with developing rapport with counsel, because his narcissism was a significant barrier. She opined that Jenkins' difficulties in working with counsel stemmed from a personality disorder. She explained that Jenkins believed he was "smarter than anybody in the room" and that any strategy was going to be flawed if it was not Jenkins' own.

Gutnik recounted his interactions with Jenkins. He first saw Jenkins in March 2011. When he next saw Jenkins in November 2013, Gutnik concluded that Jenkins was not competent and diagnosed him with "schizophrenia versus schizoaffective disorder, depressed type, and rule out personality disorder otherwise not specified." When Gutnik saw Jenkins in May 2014 and April and December 2015, Gutnik concluded that Jenkins remained psychotic with the same diagnoses. Gutnik saw Jenkins in June 2016 and found that Jenkins continued to have schizoaffective disorder.

Gutnik testified that Jenkins' multiple mutilations of his own penis would be an indication of severe mental illness. He thought a person would "have to be fairly out of touch and psychotic to be able to not react to that level of pain." Gutnik noted that four other psychiatrists thought Jenkins was psychotic and that Jenkins' delusions about Egyptian gods dated back to 2009—before the crimes at issue. Gutnik did not believe that Jenkins was malingering, because "he has been consistently psychotic every time that I've seen him."

On September 20, 2016, the court entered an order on Jenkins' motion to determine whether he was competent to proceed with the sentencing phase. The court recognized the competing opinions of Gutnik and Cimpl Bohn. It stated that Gutnik saw Jenkins on a limited basis, whereas Cimpl Bohn and her staff had regular communication with Jenkins. The court also found it significant that during Jenkins' testimony at the May 2016 competency hearing, Jenkins ably

followed the questions of his attorney and supplied appropriate answers. The court accepted the opinion of Cimpl Bohn and found that Jenkins was competent to proceed with the sentencing phase.

(c) Discussion

We begin by addressing what would at first blush appear to be inconsistent decisions regarding Jenkins' competence. In February 2014, the court found Jenkins competent to stand trial. Subsequently, it allowed Jenkins to waive his right to counsel, to enter pleas of no contest, and to waive his right to have a jury determine whether aggravating circumstances existed. Then, in July, the court found that Jenkins was not competent to proceed with sentencing. From the timing of events, it would appear that the court's reversal was precipitated by its reappointment of counsel and counsel's motion to determine whether Jenkins was competent.

The court's order reflects that it found Jenkins to be not competent only out of an abundance of caution. Its order contained the following quote: "'If at any time while criminal proceedings are pending facts are brought to the attention of the court, either from its own observation or from suggestion of counsel, which raise a doubt as to the sanity of the defendant, the question should be settled before further steps are taken.'"[33] The court explained: "This Court must be satisfied that [Jenkins] is competent to proceed with the sentencing phase of a death penalty case. The fact that this is a death penalty case heightens the concern and consideration of this Court." The court prudently allowed a lengthy evaluation process to occur, and in September 2016, the court found that Jenkins was competent to proceed with sentencing.

The record shows that the court received conflicting expert evidence throughout the proceedings as to Jenkins' competency. The court also had abundant opportunities to interact with and observe Jenkins. Ultimately, the court accepted Cimpl Bohn's

---

[33] *State v. Campbell*, 192 Neb. 629, 631, 223 N.W.2d 662, 663 (1974).

opinion that Jenkins was competent. Sufficient evidence in the record supports the court's determination; therefore, we will not disturb the court's finding of competency.

### 4. Ex Post Facto Challenge

Jenkins contends that the court erred by denying his motion to preclude the death penalty as a violation of the Ex Post Facto Clauses of the U.S. and Nebraska Constitutions.[34] We disagree.

### (a) Standard of Review

[18] The constitutionality of a statute presents a question of law, which an appellate court independently reviews.[35]

### (b) Additional Background

In May 2015, the Nebraska Legislature passed 2015 Neb. Laws, L.B. 268,—which abolished the death penalty in Nebraska—and then overrode the Governor's veto of the bill. The Legislature adjourned sine die on May 29. Because L.B. 268 did not contain an emergency clause, it was to take effect on August 30.[36]

Following the passage of L.B. 268, opponents of the bill sponsored a referendum petition to repeal it. On August 26, 2015, the opponents filed with the Nebraska Secretary of State signatures of approximately 166,000 Nebraskans in support of the referendum. On October 16, the Secretary of State certified the validity of sufficient signatures. Enough signatures were verified to suspend the operation of L.B. 268 until the referendum was approved or rejected by the electors at the upcoming election. During the November 2016 election, the referendum passed and L.B. 268 was repealed, that is, in the language of the constitution, the act of the Legislature was "reject[ed]."[37]

---

[34] U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16.

[35] *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017).

[36] See Neb. Const. art. III, § 27.

[37] See Neb. Const. art. III, § 3.

### (c) Discussion

Jenkins' ex post facto argument focuses on his uncertainty as to whether the repeal of the death penalty was in effect for a period of time. We first explain that there is technically no ex post facto violation for Jenkins, then we resolve the issue presented by Jenkins under what we sometimes refer to as the "*Randolph* doctrine."[38]

[19-21] An ex post facto law is a law which purports to apply to events that occurred before the law's enactment and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed.[39] There are four types of ex post facto laws: those which (1) punish as a crime an act previously committed which was innocent when done; (2) aggravate a crime, or make it greater than it was, when committed; (3) change the punishment and inflict a greater punishment than was imposed when the crime was committed; and (4) alter the legal rules of evidence such that less or different evidence is needed in order to convict the offender.[40] The Ex Post Facto Clause "bars only application of a law that '"changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed."'"[41] The clause's underlying purpose is to "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed."[42]

Here, the death penalty was in effect at the time of Jenkins' crimes in 2013. It was also in effect at the time that Jenkins was sentenced. Because the repeal of the repeal of the death penalty did not inflict a greater punishment than that available when Jenkins committed the crimes, there is no ex post facto law.

---

[38] See *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971).

[39] See *State v. Amaya*, 298 Neb. 70, 902 N.W.2d 675 (2017).

[40] *Id.*

[41] *State v. Kantaras*, 294 Neb. 960, 972, 885 N.W.2d 558, 567 (2016).

[42] *Weaver v. Graham*, 450 U.S. 24, 28-29, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981).

[22] But Jenkins also claims that under *State v. Randolph*,[43] a defendant is entitled to take advantage of any reduction in penalties before final disposition. Under the *Randolph* doctrine, generally, when the Legislature amends a criminal statute by mitigating the punishment after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature specifically provided otherwise.[44]

This contention presupposes that L.B. 268 became operative. Jenkins contends that it took effect on August 30, 2015, and remained in effect until October 16, when the Secretary of State confirmed the validity and number of signatures. On the other hand, the State argues that the bill never went into effect, because its operation was suspended by the referendum petition until approved by Nebraska voters. We agree with the State.

We pause to discuss the referendum process provided for in the Nebraska Constitution.[45] As pertinent here, petitions invoking the referendum must be signed by not less than 5 percent of Nebraska's registered voters and filed in the Secretary of State's office within 90 days after the Legislature which passed the bill adjourned sine die.[46] "Upon the receipt of the petitions, the Secretary of State, with the aid and assistance of the election commissioner or county clerk, shall determine the validity and sufficiency of signatures on the pages of the filed petition."[47] The Secretary of State must total the valid signatures and determine whether constitutional and statutory requirements have been met.[48] With two exceptions not applicable here, an act is suspended from taking effect prior to a

---

[43] *State v. Randolph, supra* note 38.

[44] *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017).

[45] See Neb. Const. art. III, § 3.

[46] See *id.*

[47] Neb. Rev. Stat. § 32-1409(1) (Reissue 2016).

[48] § 32-1409(3).

referendum election when the referendum petition is signed by at least 10 percent of the state's registered voters.[49]

We reject the notion that signatures must be verified and certified before the act's operation will be suspended. An earlier case implicitly determined that this notion is not correct.[50] That case presented the following pertinent timeline of events in 1965:

• July 1: The legislative bill at issue became law.
• August 17: The Legislature adjourned sine dine.
• September 29: A referendum petition and affidavit as to persons contributing things of value in connection with the petition were filed.
• November 15: Additional certificates and a supplemental statement were filed in connection with the petition.
• December 13: The Secretary of State certified that valid signatures of more than 10 percent of electors had been filed.

Our decision noted that there were sufficient signatures to suspend the act from taking effect; there was no suggestion that the act went into effect on November 17 (3 calendar months after adjournment) and remained in effect until December 13 (when the Secretary of State certified that the petition contained signatures of more than the 10-percent requirement).

[23] Jenkins' notion conflicts with several fundamental principles. The power of referendum must be liberally construed to promote the democratic process.[51] The power is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter.[52] The constitutional provisions with respect to the right of referendum reserved to the people should be construed to make effective the powers reserved.[53]

---

[49] See, Neb. Const. art. III, § 3; *Pony Lake Sch. Dist. v. State Committee for Reorg.*, 271 Neb. 173, 710 N.W.2d 609 (2006).

[50] *Klosterman v. Marsh*, 180 Neb. 506, 143 N.W.2d 744 (1966).

[51] See *Hargesheimer v. Gale*, 294 Neb. 123, 881 N.W.2d 589 (2016).

[52] See *id.*

[53] See *Pony Lake Sch. Dist. v. State Committee for Reorg., supra* note 49.

Stated another way, the provisions authorizing the referendum should be construed in such a manner that the legislative power reserved in the people is effectual.[54] The right of referendum should not be circumscribed by narrow and strict interpretation of the statutes pertaining to its exercise.[55]

Jenkins' contention—that suspension cannot occur until a sufficient number of signatures are certified—would make ineffectual the people's power to suspend an act's operation. Whether an act went into effect, and for how long, would depend upon how quickly the Secretary of State and election officials counted and verified signatures. Jenkins' argument demonstrates the absurdity of such a view. Because the Secretary of State was unable to confirm that a sufficient number of voters signed the petitions until October 16, 2015, Jenkins contends that L.B. 268 went into effect on August 30, thereby changing all death sentences to life imprisonment and changing the status of any defendant facing a potential death sentence to a defendant facing a maximum sentence of life imprisonment. Such an interpretation would defeat the purpose of this referendum—to preserve the death penalty. Our constitution demands that the power of referendum not be impaired by ministerial tasks appurtenant to the process. Having produced the signatures necessary to suspend the act's operation, the people were entitled to implementation of their will.

[24] We conclude that upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act is suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures. And Jenkins did not dispute either the sufficiency of the signatures or the outcome of the referendum election. Accordingly, the filing of petitions on August 26, 2015—prior to the effective date of L.B. 268—suspended its operation until Nebraskans

---

[54] See *id.*

[55] See *Hargesheimer v. Gale, supra* note 51.

effectively rejected the bill by voting to repeal it. Because L.B. 268 never went into effect, the *Randolph* doctrine has no application.

### 5. Constitutionality of Death Penalty Procedure

Jenkins argues that Nebraska's death penalty scheme violates the 6th and 14th Amendments to the U.S. Constitution and Neb. Const. art. I, §§ 3 and 6. He contends that Nebraska's statutory procedure is unconstitutional because, he asserts, it does not require a jury to find each fact necessary to impose a sentence of death.

### (a) Standard of Review

The constitutionality of a statute presents a question of law, which an appellate court independently reviews.[56]

### (b) Additional Background

Under Nebraska law, a jury's participation in the death penalty sentencing phase, if not waived,[57] ceases after the determination of aggravating circumstances.[58] If no aggravating circumstance is found to exist, the court enters a sentence of life imprisonment without parole.[59] But if the jury finds that one or more aggravating circumstances exist, the court convenes a panel of three judges to receive evidence of mitigation and sentence excessiveness or disproportionality.[60] In determining an appropriate sentence, the panel considers whether the aggravating circumstances as determined to exist justified imposition of a death sentence, whether mitigating circumstances existed which approached or exceeded the weight given to the aggravating circumstances, or whether the sentence of death

---

[56] *State v. Stone, supra* note 35.

[57] See Neb. Rev. Stat. § 29-2520(3) (Cum. Supp. 2018).

[58] § 29-2520(4)(g).

[59] § 29-2520(4)(h).

[60] *Id.*

was excessive or disproportionate to the penalty imposed in similar cases.[61]

### (c) Discussion

Jenkins argues that Nebraska's scheme violates the Sixth Amendment, relying upon the U.S. Supreme Court's decision in *Hurst v. Florida*.[62] In that decision, the opinion includes a statement that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death."[63] According to Jenkins, Nebraska's law is contrary to *Hurst* because judges determine the existence or nonexistence of mitigating circumstances and perform the weighing process. He takes the position that the determination of the existence of mitigating factors, the weighing process of the aggravating and mitigating circumstances, and the proportionality review must be performed by a jury. Because Jenkins waived a jury and expressly stated he would "rather have the judges" for sentencing, we doubt he has standing to attack the constitutionality of Nebraska's procedure on the grounds he asserts.[64] But, in any event, he is wrong.

We recently discussed *Hurst* in detail in *State v. Lotter*.[65] We rejected an argument that *Hurst* held a jury must find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. In doing so, we cited a number of federal and state courts reaching the same conclusion, but acknowledged that the view was not universal.[66] Further, we recognized our previous decision[67] that earlier U.S. Supreme Court precedent—upon which *Hurst*

---

[61] Neb. Rev. Stat. § 29-2522 (Cum. Supp. 2018).

[62] *Hurst v. Florida*, ___ U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016).

[63] *Id.*, 136 S. Ct. at 619.

[64] See *U.S. v. Skinner*, 25 F.3d 1314 (6th Cir. 1994).

[65] See *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018), *cert. denied* No. 18-8415, 2019 WL 1229787 (U.S. June 17, 2019).

[66] See *id.*

[67] See *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003).

was based—did not require the determination of a mitigating circumstance, the balancing function, or the proportionality review to be undertaken by a jury. Nothing in *Hurst* requires a reexamination of that conclusion. This assignment of error lacks merit.

### 6. Whether Death Penalty Is Cruel and Unusual Punishment When Imposed on Seriously Mentally Ill Offenders and Individuals With Intellectual Disability

Jenkins begins his argument that the death penalty is cruel and unusual punishment when imposed on certain offenders by pointing to U.S. Supreme Court precedent[68] declaring that the Eighth Amendment prohibits the execution of individuals with mental retardation. And he correctly observes that the Nebraska Legislature responded by precluding the imposition of the death penalty on any person with an intellectual disability.[69] We agree with Jenkins' general assertions that a person with an intellectual disability may not be executed. However, Jenkins does not assert or argue that he suffers from an intellectual disability. Therefore, whether Jenkins should be ineligible for the death penalty on that basis is not before us.

[25] Unlike situations of intellectual disability, neither the U.S. Supreme Court nor the Nebraska Legislature has explicitly precluded the death penalty for an individual with a severe mental illness. Rather, the Supreme Court has held that the Eighth Amendment forbids executing a prisoner whose mental illness makes him or her unable to "reach a rational understanding of the reason for [his or her] execution."[70] Whether a prisoner has any particular mental illness is not determinative; rather, what matters is whether a prisoner has

---

[68] See *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[69] See Neb. Rev. Stat. § 28-105.01(2) (Cum. Supp. 2018).

[70] *Panetti v. Quarterman*, 551 U.S. 930, 958, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

a rational understanding of why he or she is to be executed.[71]
The Supreme Court explained:

> [The] standard [of *Panetti v. Quarterman*[72]] focuses on
> whether a mental disorder has had a particular *effect*: an
> inability to rationally understand why the State is seeking
> execution. . . . Conversely, that standard has no interest
> in establishing any precise *cause*: Psychosis or dementia,
> delusions or overall cognitive decline are all the same
> under *Panetti*, so long as they produce the requisite lack
> of comprehension.[73]

We observe that other courts have determined a diagnosis of
schizophrenia or paranoid schizophrenia[74] does not preclude
a death sentence where the defendant is competent to be
executed.

Jenkins does not argue that he lacks the requisite under-
standing of the reason for his execution. Rather, he argues that
the same rationale for exempting the intellectually disabled
from the death penalty should apply to exempt defendants who
are seriously mentally ill from that punishment. We decline to
vary from the principle articulated in *Panetti*.

Moreover, we are not persuaded that, even if we were to
stray beyond *Panetti*, Jenkins would qualify for relief. The
record reveals a conflict in expert opinion as to whether
Jenkins suffered from a serious or severe mental illness.

Some professionals had no doubt that Jenkins was severely
mentally ill. Oliveto and Gutnik diagnosed Jenkins with
schizophrenia. A different psychiatrist diagnosed Jenkins with
schizoaffective disorder, bipolar type. Psychiatrists Baker and

---

[71] See *Madison v. Alabama*, ___ U.S. ___, 139 S. Ct. 718, 203 L. Ed. 2d 103 (2019).

[72] *Panetti v. Quarterman, supra* note 70.

[73] *Madison v. Alabama, supra* note 71, 139 S. Ct. at 728.

[74] See, *Lindsay v. State*, No. CR-15-1061, 2019 WL 1105024 (Ala. App. Mar. 8, 2019); *Ferguson v. State*, 112 So. 3d 1154 (Fla. 2012); *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002); *Com. v. Jermyn*, 551 Pa. 96, 709 A.2d 849 (1998); *Berry v. State*, 703 So. 2d 269 (Miss. 1997).

Wetzel expressed that Jenkins could have a severe mental illness or that he could be malingering.

Other professionals opined that Jenkins was not severely mentally ill. Dr. Mark Weilage, who met with Jenkins in 2012, concluded that Jenkins had no major mental illness. Hartmann did not believe Jenkins had a major mental disorder. Moore believed that Jenkins' main diagnosis was antisocial personality disorder. Cimpl Bohn, Chaturvedi, and Scalora opined that Jenkins suffered from a significant severe personality disorder marked by antisocial, narcissistic, and borderline traits and that he malingered other symptoms. Psychiatrist Dr. Cheryl Jack met with Jenkins in April 2013, and her impression was "'Axis I: No diagnosis; and Axis II: Antisocial Personality, with narcissistic features vs. Narcissistic Personal[i]ty with antisocial features.'" And in December 2009, Baker concluded that Jenkins' symptoms were "'more behavioral/Axis II in nature.'"

There is no doubt that Jenkins exhibited abnormal behaviors. But a number of experts believed that he was malingering. A test revealed scores indicative of feigning a mental disorder. In support of the view that Jenkins was not malingering, some—Gutnik, in particular—pointed to Jenkins' having hallucinations dating back to age 8. But Dahlke's 1995 psychological report revealed a misunderstanding as to the reported hallucinations:

> A previous report had said [Jenkins] heard voices telling him to do bad things. On further inquiry, [Jenkins] said these are real voices of these older boys, and he only hears them when the boys are there with him. There was no evidence of psychosis or auditory hallucination in this interview. It may be that [Jenkins] misunderstood the question in the previous interview.

A December 1997 medical report—when Jenkins was age 11—stated that Jenkins denied auditory and/or visual hallucinations. A psychiatric assessment from July 1999 likewise stated that Jenkins denied any auditory or visual hallucinations.

The record contains credible expert testimony that Jenkins has been feigning mental illness. We are not persuaded that Jenkins suffers from a serious mental illness. Thus, we need not determine in this case whether either the U.S. Constitution or the Nebraska Constitution would prohibit imposing capital punishment on an offender who actually suffers from a serious mental illness. A court decides real controversies and determines rights actually controverted, and does not address or dispose of abstract questions or issues that might arise in a hypothetical or fictitious situation or setting.[75]

### 7. Whether Death Penalty Violates Eighth Amendment and Neb. Const. art. I, § 9, in All Cases

Jenkins asserts that the death penalty in all cases violates both the federal and state Constitutions. He contends this is so "[f]or all of the reasons set forth by Justice Breyer in G*lossip v. Gross*[76] . . . ."[77] In *Glossip*, Justice Breyer authored a dissenting opinion explaining why he "believe[d] it highly likely that the death penalty violates the Eighth Amendment"[78] and Justice Scalia offered a persuasive rebuttal in a concurring opinion.[79] But more importantly, the majority of the U.S. Supreme Court expressly recognized "it is settled that capital punishment is constitutional."[80]

Justice Breyer believed that the death penalty was unreliable. In *Glossip*, he pointed to evidence that innocent people have been convicted, sentenced to death, and executed. But

---

[75] *Stewart v. Heineman*, 296 Neb. 262, 892 N.W.2d 542 (2017).

[76] See *Glossip v. Gross*, ___ U.S. ___, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015) (Breyer, J., dissenting; Ginsburg, J., joins).

[77] Brief for appellant at 139.

[78] *Glossip v. Gross, supra* note 76, 135 S. Ct. at 2776-77.

[79] See *Glossip v. Gross, supra* note 76 (Scalia, J., concurring; Thomas, J., joins).

[80] *Id.*, 135 S. Ct. at 2732. See *Bucklew v. Precythe*, ___ U.S. ___, 139 S. Ct. 1112, 203 L. Ed. 2d 521 (2019).

Justice Scalia reasoned that "it is *convictions*, not *punishments*, that are unreliable."[81] He asserted, "That same pressure [to secure a conviction] would exist, and the same risk of wrongful convictions, if horrendous death-penalty cases were converted into equally horrendous life-without-parole cases."[82]

Justice Breyer viewed the death penalty as being imposed arbitrarily. He cited studies indicating that comparative egregiousness of the crime often did not affect application of the death penalty and other studies showing that circumstances such as race, gender, or geography often do affect its application. But "[a]pparent disparities in sentencing are an inevitable part of our criminal justice system."[83] Justice Scalia described variance in judgments as a consequence of trial by jury and reasoned that "the fact that some defendants receive mercy from their jury no more renders the underlying punishment 'cruel' than does the fact that some guilty individuals are never apprehended, are never tried, are acquitted, or are pardoned."[84]

Justice Breyer also felt that the death penalty was cruel due to excessively long delays before execution. But a majority of the U.S. Supreme Court stated that "[t]he answer is not . . . to reward those who interpose delay with a decree ending capital punishment by judicial fiat."[85]

Justice Breyer believed that lengthy delays undermined the penological justification. A punishment is unconstitutional if it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless

---

[81] *Glossip v. Gross, supra* note 76, 135 S. Ct. at 2747 (Scalia, J., concurring; Thomas, J., joins) (emphasis in original).

[82] *Id.*

[83] *McCleskey v. Kemp*, 481 U.S. 279, 312, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).

[84] *Glossip v. Gross, supra* note 76, 135 S. Ct. at 2748 (Scalia, J., concurring; Thomas, J., joins).

[85] *Bucklew v. Precythe, supra* note 80, 139 S. Ct. at 1134.

and needless imposition of pain and suffering."[86] The two punishment goals that the death penalty is said to serve are deterrence of capital crimes by prospective offenders and retribution.[87] This record does not refute the existence of these goals, and the people's judgment speaks in support of their continued vitality.

Jenkins also asserted that the death penalty runs against evolving standards of decency. He pointed out that it is prohibited by 19 (now 21)[88] states and that at least 4 states have governor-imposed moratoria. But as Justice Scalia observed:

> Time and again, the People have voted to exact the death penalty as punishment for the most serious of crimes. Time and again, this Court has upheld that decision. And time and again, a vocal minority of this Court has insisted that things have "changed radically," . . . and has sought to replace the judgments of the People with their own standards of decency.[89]

Less than 3 years ago, Nebraskans had the opportunity to eliminate the death penalty and 61 percent voted to retain capital punishment.[90] This vote demonstrates that the people of Nebraska do not view the death penalty as being contrary to standards of decency. As the majority of the U.S. Supreme Court recently explained: That the Constitution allows capital punishment "doesn't mean the American people must

---

[86] *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977).

[87] See *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

[88] See, *State v. Gregory*, 192 Wash. 2d 1, 427 P.3d 621 (2018) (holding that death penalty, as administered in State of Washington, violated state constitution); N.H. Rev. Stat. Ann. § 630:1 (2019).

[89] *Glossip v. Gross, supra* note 76, 135 S. Ct. at 2749 (Scalia, J., concurring; Thomas, J., joins).

[90] See Legislative Journal, 150th Leg., 1st Sess. 18 (Jan. 4, 2017) (showing 320,719 votes to retain legislation eliminating death penalty and 494,151 votes to repeal such legislation).

continue to use the death penalty. The same Constitution that permits States to authorize capital punishment also allows them to outlaw it. But it does mean that the judiciary bears no license to end a debate reserved for the people and their representatives."[91] In Nebraska, the people have spoken.

[26] The U.S. Supreme Court has not found the death penalty to be unconstitutional in all cases. As the Fifth Circuit determined, "We are bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance[s]."[92] Similarly, we do not find the death penalty to be a violation of the Nebraska Constitution.[93]

### 8. SENTENCE OF DEATH— FACTS FROM PLEA

Jenkins assigns that the sentencing panel erred in sentencing him to death based on facts alleged during the proceeding on his no contest plea. We disagree.

### (a) Standard of Review

[27] In a capital sentencing proceeding, this court conducts an independent review of the record to determine if the evidence is sufficient to support imposition of the death penalty.[94]

### (b) Additional Background

During the death penalty sentencing phase, the State offered exhibit 81, the transcript from the plea hearing. Jenkins' counsel objected to the use of the transcript of the plea for any purpose and stated that the statements of the prosecutor were unsworn and were hearsay. The State represented that the purpose of the exhibit was to show that Jenkins was convicted

---

[91] *Bucklew v. Precythe, supra* note 80, 139 S. Ct. at 1122-23.

[92] *U.S. v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998). See, also, *U.S. v. Quinones*, 313 F.3d 49 (2d Cir. 2002) (noting that argument relying upon Eighth Amendment is foreclosed by Supreme Court's decision).

[93] See *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

[94] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

of those particular crimes. The sentencing panel received the exhibit for any statements made by Jenkins against interests and for findings of the court. The panel stated that it would receive the statements by the prosecutor, but not for the truth of the matter asserted.

The sentencing panel's order specifically states that the "factual descriptions come from [the] factual basis given by the State at the time of [Jenkins'] pleas of no contest to all counts on April 16, 2014, Exhibit 81." The order then set forth the same facts from the plea hearing regarding each murder that we included in the portion of our analysis addressing the acceptance of Jenkins' pleas.

### (c) Discussion

Jenkins' argument is premised upon a rule of evidence. He points to the rule stating:

> Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal action, case, or proceeding against the person who made the plea or offer. This rule shall not apply to the introduction of voluntary and reliable statements made in court on the record in connection with any of the foregoing pleas or offers when offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement.[95]

We have stated that this evidentiary rule does not apply to the sentencing stage.[96]

For practical purposes, a plea of no contest has the same effect as a plea of guilty with regard to the case in which it is entered.[97] The difference between a plea of no contest and

---

[95] Neb. Evid. R. 410, Neb. Rev. Stat. § 27-410 (Reissue 2016).

[96] See *State v. Klappal*, 218 Neb. 374, 355 N.W.2d 221 (1984).

[97] See *State v. Wiemer*, 15 Neb. App. 260, 725 N.W.2d 416 (2006).

a plea of guilty appears simply to be that while the latter is a confession or admission of guilt binding the accused in other proceedings, the former has no effect beyond the particular case.[98] But the facts admitted via a no contest plea can be used in the proceeding involving the no contest plea.[99]

We have recognized that strict rules of evidence do not apply at the sentencing phase. The sentencing phase is separate and apart from the trial phase, and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.[100] A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence.[101]

[28,29] But there is a caveat to this general rule, which Jenkins recognizes. A capital sentencing statute dictates: "The Nebraska Evidence Rules shall apply to evidence relating to aggravating circumstances."[102] And there is authority for the proposition that a no contest plea constitutes an admission of all the elements of the offenses, but not an admission to any aggravating circumstance for sentencing purposes.[103] So while the sentencing panel could consider Jenkins' no contest plea and the factual basis underlying it, it could not use it as an admission to aggravating circumstances.

---

[98] See *id.*

[99] See *State v. Simnick*, 17 Neb. App. 766, 771 N.W.2d 196 (2009), *reversed in part on other grounds* 279 Neb. 499, 779 N.W.2d 335 (2010).

[100] *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata, supra* note 93.

[101] *Id.*

[102] Neb. Rev. Stat. § 29-2521(2) (Cum. Supp. 2018).

[103] See *People v. French*, 43 Cal. 4th 36, 178 P.3d 1100, 73 Cal. Rptr. 3d 605 (2008). See, also, 21 Am. Jur. 2d, *supra* note 13; 22 C.J.S. *Criminal Procedure and Rights of Accused* § 238 (2016).

Upon our independent review, we conclude that the sentencing panel's "Finding as to Aggravators" is supported by evidence adduced during the death penalty sentencing phase. Testimony of a police officer who investigated the homicide scenes of all the murder victims and who interviewed Jenkins in connection with the murders established that Jenkins murdered Uribe-Pena and Cajiga-Ruiz at the same time and that based on those murders, Jenkins had a substantial prior history of serious assaultive or terrorizing criminal activity by the time of the murders of Bradford and Kruger. Additionally, based on certified copies of convictions and the testimony of two armed robbery victims of Jenkins, the sentencing panel found that Jenkins, at the time of all the murders, had previously been convicted of crimes involving the use of threats of violence. Although the sentencing panel stated that it used the factual basis from the no contest plea hearing, the panel's findings as to aggravating circumstances were supported by evidence adduced during the sentencing hearing. This assignment of error lacks merit.

### 9. SENTENCE OF DEATH— MITIGATING FACTORS

Jenkins assigns error to the sentencing panel's failure "to give meaningful consideration to his lifelong serious mental illness, his unfulfilled request for commitment before the crime, and the debilitating impact of solitary confinement in violation of Fifth, Eighth, and Fourteenth amendments to the U.S. Constitution and Article I Sections 3 and 9 of the Nebraska Constitution." We constrain our analysis to the three areas assigned by Jenkins.

### (a) Standard of Review

[30] The sentencing panel's determination of the existence or nonexistence of a mitigating circumstance is subject to de novo review by this court.[104]

---

[104] *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012).

[31] In reviewing a sentence of death, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty.[105]

### (b) Additional Background

#### (i) Lifelong Mental Illness

Jenkins' records show a history of behavioral issues. His first interaction with mental health professionals was in 1995, at age 8, when he was evaluated at a hospital. A letter in 1998 noted that "the majority of his difficulties seem to be behavioral rather than mental health in nature." In 1999, a psychiatric assessment stated that Jenkins "appeared very manipulative . . . and would appear to take on a victim role" and the diagnosis contained therein showed "Conduct Disorder" under "Axis I: Clinical Disorders." In 2001, a report stated: "Personality assessment suggests a Conduct Disorder, adolescent onset type, an Oppositional Defiant Disorder, and a Developing Antisocial Personality Disorder. No other problems of anxiety, depression, or psychosis were indicated."

The panel received the deposition of a chaplain at the Douglas County Youth Detention Center while Jenkins "was kind of a regular" there. The chaplain testified that he and Jenkins "hung out all the time" when Jenkins was 15 to 16 years old. Although not a mental health specialist, the chaplain did not observe any indications of mental illness in Jenkins. He did not recall Jenkins ever talking about Egyptian gods.

Baker testified that she had always thought Jenkins was mentally ill, but that she was not sure if his behaviors were due to mental illness or malingering. Weilage informed Jenkins in 2012 that a mental illness review team believed "'there was not an Axis I severe mental illness present'" to justify transferring Jenkins to an inpatient mental health unit at the Lincoln

---

[105] *Id.*

Correctional Center. And we have already detailed the conflicting evidence concerning whether Jenkins suffered from a serious mental illness or was malingering.

#### (ii) Requests for Commitment

In February 2013—months before Jenkins' scheduled release from prison—he sent an informal grievance to the warden requesting emergency protective custody and psychiatric hospitalization. In a grievance to the warden sent the next day, Jenkins advised that his mother was seeking an emergency protective custody order for psychiatric hospitalization. In a March letter to a member of the Nebraska Board of Parole, Jenkins stated that he had filed an emergency protective custody petition in Johnson County, Nebraska, to be submitted to the county's mental health board. The Johnson County Attorney's office acknowledged receipt of letters regarding Jenkins' mental health.

#### (iii) Effect of Solitary Confinement

Jenkins spent extensive time on room restriction and in disciplinary segregation. According to an ombudsman report, as much as 60 percent of Jenkins' time with the Department of Correctional Services was in segregation. On at least nine occasions between January 2009 and January 2012, Jenkins spent periods of at least 45 days in disciplinary segregation, five of those being 60 days in length.

The Douglas County Youth Detention Center chaplain testified that he kept in communication with Jenkins over the years. In 2009 or 2010, Jenkins told the chaplain that Jenkins had been in solitary confinement for 2 years. According to the chaplain, Jenkins was "different": "Angry, saying he wants to hurt people, wants to hurt himself. He was going crazy, said he's just sitting in his cell."

Kirk Newring, Ph.D., testified that extended periods of time in solitary confinement or segregation typically exacerbates any existing mental health diagnoses or condition.

He testified that "[i]f somebody is in segregation and can't come up with other solutions, recurrent self-injury would not be unexpected as a problem-solving approach." Cimpl Bohn acknowledged that solitary confinement is generally not something that helps people become psychologically healthier, especially for individuals with a mental illness. Hartmann testified that an extended period of time in solitary confinement is "an extremely stressful experience" and that it could be detrimental to a person's mental health.

The ombudsman's report recognized that a board-certified psychiatrist who evaluated more than 200 prisoners to determine the psychiatric effects of solitary confinement concluded that "'such confinement may result in prolonged or permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison.'" (Emphasis omitted.) The report also acknowledged the research of a professor of psychology who had studied the psychological effects of solitary confinement for more than 30 years: "'The psychological consequences of incarceration may represent significant impediments to post-prison adjustment.'"

### (c) Discussion

[32,33] A sentencer may consider as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[106] As noted, we review de novo the sentencing panel's determination of the existence or nonexistence of a mitigating circumstance.[107] We look to whether the sentencer "fairly considered the defendant's proposed mitigating circumstances prior to rendering its decision."[108] The

---

[106] See *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).

[107] *State v. Torres, supra* note 104.

[108] See *State v. Ryan*, 233 Neb. 74, 147, 444 N.W.2d 610, 654 (1989).

risk of nonproduction and nonpersuasion as to mitigating circumstances is on the defendant.[109]

Jenkins assigns that the sentencing panel failed to give "meaningful consideration" to his lifelong history of mental illness. The sentencing panel recognized "significant divergence of opinion offered by mental health professionals as to whether Jenkins suffers from a mental illness, or if he is feigning mental illness." It accepted the opinions of Cimpl Bohn and her team and found that no statutory mitigating circumstance was proved. Nonetheless, the sentencing panel found that Jenkins' bad childhood was a nonstatutory mitigator to be considered in the weighing process as was his mental health. The panel's seven-page analysis of the bad childhood circumstance included discussion of mental health records from Jenkins' childhood and adolescent years. The panel adequately considered Jenkins' mental health issues, and we agree with its conclusion.

Jenkins also contends that the sentencing panel erred by failing to consider that the killings would have been prevented if his request to be committed had been fulfilled. But we do not find anywhere on the record where Jenkins advised the panel that he wished for such requests to be considered as a nonstatutory mitigating factor. The absence of such request likely explains why the panel's order did not discuss such requests. While there was evidence that Jenkins requested to be committed, we will not fault the panel for failing to discuss a nonstatutory mitigating circumstance that it was not specifically asked to consider. And although we review the sentencing panel's determination of the existence or nonexistence of mitigating circumstances de novo, we do so only on the record. To the extent the record contains evidence of Jenkins' requests for commitment, his argument now relies only on speculation and conjecture. We have considered it and find it to be without merit.

---

[109] See *State v. Torres, supra* note 104.

Finally, Jenkins asserts that his extensive time in solitary confinement should have been considered a mitigating circumstance. Our review of the record shows that contrary to Jenkins' assertion, the sentencing panel considered the impact of solitary confinement. The sentencing panel recognized Jenkins' "extensive history of misconduct in the State Penitentiary"; however, it found insufficient evidence to support solitary confinement as a nonstatutory mitigator. We see no error.

Unfortunately, solitary confinement can be a "necessary evil." Justice Kennedy stated:

> Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.[110]

Here, Jenkins' own actions led to his disciplinary segregation. The Department of Correctional Services must have some recourse to deal with an inmate who does such things as manufacture a weapon from a toilet brush, threaten to assault staff, assault staff, attempt to escape, and interfere with or refuse to submit to a search. The sentencing panel acted reasonably in not rewarding such behavior by considering the resulting confinement as a mitigating factor. Upon our de novo review, we reach the same conclusion.

We affirm Jenkins' death sentences.

## V. CONCLUSION

Many of the issues in this death penalty appeal turn on Jenkins' competency and mental health. Evidence touching on these matters was abundant and highly conflicting. The trial court and the sentencing panel, like the members of this court,

---

[110] *Davis v. Ayala*, ___ U.S. ___, 135 S. Ct. 2187, 2210, 192 L. Ed. 2d 323 (2015) (Kennedy, J., concurring).

are not medical experts. In light of the conflicting evidence, they gave weight to the expert evidence reflecting that Jenkins suffered from a personality disorder and was feigning mental illness. We find no error in that regard.

We cannot say that the district court abused its discretion in finding Jenkins to be competent to waive counsel, to enter no contest pleas, to proceed to sentencing, and to be sentenced to death. We reject Jenkins' constitutional challenges to the death penalty and affirm his convictions and sentences.

Affirmed.

Papik and Freudenberg, JJ., not participating.