IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. DEAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JARON DEAN, APPELLANT.

Filed April 29, 2025.   No. A-24-091.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

JaRon Dean, pro se, and Brett McArthur for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

A jury found JaRon Dean guilty of assault in the second degree, use of a deadly weapon to commit a felony, and child abuse. On appeal, Dean argues that the Lancaster County District Court erred in denying him his right to waive counsel and by imposing an excessive sentence. We affirm.

## BACKGROUND

On April 12, 2023, the State filed an information charging Dean with three counts: assault in the second degree, a Class IIA felony, in violation of Neb. Rev. Stat. § 28-309 (Reissue 2016); use of a deadly weapon to commit a felony, a Class II felony, in violation of Neb. Rev. Stat. § 28-1205(1)(b) (Cum. Supp. 2024); and child abuse, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-707(3) (Cum. Supp. 2024).

The charges arose from an incident occurring in February 2023. Dean and his wife, Dionne D., were living separately and had last seen each other in November 2022. Between 7 and 7:15

- 1 -

a.m. on the day of the incident, Dean showed up uninvited to Dionne's house in Lincoln, Nebraska. It was their son JuMauni's ninth birthday. There was no custody order in place for JuMauni, and Dean had not seen him since November. Dionne lived with her parents, her brother, JuMauni, and another son, JaVarius, who had a different father. JaVarius was 15 years old at the time of the incident.

Dean arrived in a "zTrip" vehicle and knocked on the front door of the house, which Dionne answered. Only she and JuMauni were awake at that time. Dionne opened the door slightly and asked Dean why he was there. He stated that he wanted to see JuMauni and wish him a happy birthday. After JuMauni confirmed that he wanted to see his father, they talked through the cracked door. Dean then asked to enter the home, but Dionne did not let him in "because of all the things [he had] done and said." When Dean asked to give JuMauni a hug, JuMauni agreed, so Dionne opened the door further. Dean then "grabbed" JuMauni and started dragging him down the steps and towards the zTrip vehicle which was parked on the other side of the street. Dionne immediately grabbed JuMauni in an effort to get him back. It was cold outside, and there was some snow on the ground. However, neither JuMauni nor his mother were wearing shoes or socks, and JuMauni was only dressed in a T-shirt and "warmers that you wear under pants for the winter," but JuMauni wore them "as his pajamas sometimes." At some point, Dean began swinging at Dionne. Dionne was holding on to JuMauni with one hand and swinging back at Dean with her other hand. JuMauni kicked and screamed as his father dragged him across the yard. Once they got to the zTrip vehicle, Dean opened the door and tried to "shove" JuMauni inside. He made statements such as "this is my child" and "I'm taking my son."

Eventually, a neighbor's son who was outside working on his car intervened. He got into a physical confrontation with Dean, and Dean had to let go of JuMauni to defend himself. Once free, JuMauni and his mother ran towards the house. JuMauni made it inside, but Dionne stopped along the way when she realized the neighbor had disappeared and Dean was coming towards them again. She wanted to make sure JuMauni had enough time to get inside. At that moment, Dean hit her on the top of the head with a hammer, causing her to collapse. While she was on the ground, Dean continued to assault her, and she tried to fight back.

JaVarius saw Dean swinging at his mother from his bedroom window and went outside in shorts and boots. He began swinging at Dean in an attempt to get him to stop. After taking a few hits, Dean fell to the ground and then took off running. Once inside, Dionne discovered that she was bleeding severely. Her mother called 911, and Dionne was transported to a hospital in an ambulance. She received seven staples in her head and now has permanent indentations where the injuries occurred.

PRETRIAL PROCEEDINGS

Dean was adjudged indigent by the county court and was appointed a defense attorney. However, on April 7, 2023, he filed a "Motion for Appointment of Counsel Other Than [Defense Attorney]," and on April 11, he waived his right to counsel. After waiving his right to counsel, the county court appointed his defense attorney to serve as standby counsel. The case was bound over to the district court, and on July 25, the court allowed the initial standby counsel to withdraw due to his unavailability for the week trial had been scheduled. A substitute standby counsel was appointed to assist Dean, and it was this attorney who represented Dean at trial.

Prior to trial, Dean represented himself at various pretrial proceedings. During these proceedings, he made several nonsensical arguments. For example, at his May 10, 2023, arraignment before the district court, the following colloquy occurred:

[Dean]: Your Honor, equally critical, I am being represented by myself, in fact speaking for myself, pro persona, sui juris, legalis homo, the living, breathing man born to Earl Dean of the Dean family. My name, Ja[R]on Dean, is spelled with capital maximus and capital minimus.

Your Honor, is the name before you spelled in all caps?

[Court]: No.

[Dean]: Okay. Well, the Information that I have is in all caps, so that tells me that this complaint is brought against my trust. There's a trust with that name that's in all caps. I'm the beneficiary of that trust and you are the fiduciary administrator of the trust. And, with that being said, I want to know if you, as the -- and I want to thank you, also, for being the fiduciary administrator of this trust.

And I understand that a claim has been brought against my trust, and not the individual, because I am a living, breathing man, as I said, pro persona, legalis -- sui juris, legalis homo.

And I want to know, as my administrator of this trust that this claim has been brought about, if we can settle this. I believe a bond has been provided in this trust and the prosecution is -- Is this the prosecution right here?

[Court]: Yes. This is our chief deputy county attorney.

[Dean]: Okay. I believe that he's liable for that bond, and, if so, I want to discharge him from that liability and I want to tender the bond and see if maybe we could settle this matter.

Can I know the value of the bond and of this matter?

[Court]: What we're here on today is to arraign you, and I'd like to go ahead and proceed with that, because after you're arraigned, then you're going to get the opportunity to get discovery and all of that stuff that you're talking about.

. . . .

[Court]: Now that you've been arraigned, you can file the motion for discovery and that will be provided to you. That should be done within 14 days.

Bond is going to continue as set by the County Court.

[Dean]: So, I can't tender the bond to the trust[?]

[Court]: I don't know what you're talking about with the trust.

[Dean]: Your Honor, if you don't know what I'm talking about, I would ask you to recuse yourself. This is law I'm talking about.

[Court]: Well, this --

[Dean]: It's in the --

[Court]: -- is a criminal matter.

[Dean]: -- Black's Laws [sic] dictionary.

[Court]: This is a criminal matter. I don't --

what is the bond that was set by the County Court?

[State]: One hundred thousand dollars, 10 percent.

[Court]: One hundred thousand dollars, 10 percent, is your bond. You would have to post $10,000 to be released.

[Dean]: But you didn't answer if I could tender the bond to settle the matter.

[Court]: You can tender the $10,000 if you'd like.

[Dean]: I'm talking about in full, the 100,000, 'cause it's to the trust we're talking about, not the individual.

[Court]: If you want to pay the whole 100,000, that's up to you, but this is going to be set before Judge Nelson, it's in Courtroom 37, and you're ordered to appear at all future court dates.

All right?

. . . .

[Dean]: Thank you.

As another example, at a motion to suppress hearing on June 16, 2023, before the district court, the following exchange took place:

[Court]: Mr. Dean, are you prepared to proceed on the motion to suppress?

[Dean]: Your Honor, I think there may be a mistake. Initially, you called JaRon Dean. I believe you may be calling the wrong individual.

Your Honor, if it pleases the Court, do you have the billing information, the bill of charges?

[Court]: I'm not here to answer your questions, sir.

[Dean]: Well, we have to establish the players here, and I'm saying I'm not here. You called the wrong individual.

I'm just trying to establish if you have the right person here in your courtroom, Your Honor, if you'll allow me to.

[Court]: Go right ahead.

[Dean]: Thank you, Your Honor.

Your Honor, the paper before you, is it in all capital diminutio maxima?

[Court]: Mr. Dean, I just told you something, and that -- I meant it when I said it.

I'm not here to answer your questions. If you have something that you want to present, you may present it, but I'm not here to answer your questions.

[Dean]: Thank you, Your Honor, because the bill of a -- the bill of information is in all capital diminutio maxima, meaning this is a trust that has been charged with a crime and not the actual living human being.

I spell my name, my legal name is in capital diminutio minima, which is a legal distinction.

As the Court knows, when words and spelling are in capital diminutio maxima, this is a corporation, a de jure corporation.

As a matter of fact, it's my trust in which you are the fiduciary, the administrator of that trust, Your Honor. And I'm just here involuntarily, Your Honor, but by special appearance, on behalf of my trust to settle the claim, Your Honor.

So I ask at this time, being as the Information is not showing the actual individual here before that this case be dismissed for those reasons, Your Honor.

I make a motion to have this case dismissed.

At a pretrial hearing on August 1, 2023, before the district court, Dean acknowledged for the first time that the case was criminal, not civil. The following colloquy occurred:

[State]: Your Honor, [the] State would ask for an order precluding Mr. Dean from making objections or arguing subject matter jurisdiction in this case since this is a criminal case, not a civil case.

[Court]: Mr. Dean?

[Dean]: I object to that because I just found out that this is not a civil case, but a criminal case, and I believe there's [sic] two jurisdictions in a criminal case. Which one am I being tried under?

Could you ask the prosecution? Is it under admiralty, or is it under the common law in criminal? I'm uncertain to that. That way I could proceed knowing that.

Dean continued to make additional arguments regarding a trust and subject matter jurisdiction. At the same hearing, he asserted:

To assume that the jury [is] ignorant as far as they couldn't take in this information and understand it, it's preposterous.

As a matter of fact, Your Honor, anybody in here today can get on their phone and Google what is the significance, the legal significance, mind you, of your name in all capital letters, and guess what's going to pop up, a corporation.

. . . .

I . . . filed my affidavit of life once I realized that, hey, they charged my trust and not me. Now, had they charged me in capital letters and lower case letters, like what's on my birth certificate, I could understand that.

However, they wanted that money, so they charged the trust. Cool, I'm cool with that. Let's settle this like businessmen and women, then, is all I'm saying.

Instead of trying to treat me -- or reduce me to a slave, I say it, I've come into majority. I know what's going on. I see the war flag back there. . . . I see the courtroom flag over there. Let's proceed as we know we should, and not reduce me as a slave.

He also stated:

[E]veryone in this room who studied law knows that this is an admiralty court.

And the defense has asserted that in order for you to have jurisdiction over me in this military tribunal is to have me enter . . . an international contract in dispute under article 1, section 8, clause 17, in which I have not entered any contract.

And I would ask the prosecution to produce a contract that I have entered, and if this prosecution cannot, then this needs to be removed from this Court to a federal court because we're in the wrong Court.

Thank you.

In addition to making nonsensical arguments, Dean repeatedly interrupted the district court despite being asked to stop. At the August 1, 2023, pretrial hearing, the following exchange took place:

[Court]: In terms of a hearing date, Mr. Dean --
[Dean]: What's the cutoff -- what's the cutoff date?
[Court]: Mr. Dean --
[Dean]: Will you --
[Court]: Can you stop interrupting me, again, please?
[Dean]: I didn't know I was.
[Court] I'm in mid[-]sentence here, and then you jump in. Please stop it.
[Dean]: I apologize.
[Court]: You have to follow that rule. Do you understand that, sir?
[Dean]: I apologized.
[Court]: I will tell you when it is your time to speak.
[Dean]: Damn, it's like that?
[Court]: Just like that.
[Dean]: Well, guess what, negative.
[Court]: Mr. Dean, be quiet, please.
[Dean]: Negative.
[Court]: Mr. Dean, be quiet, please.
[Dean]: Carry on.

The case is void in itself, and they're still going to go to trial. Put a lien on her bond and access. Who the fuck she think she's fucking with? I'll show her. Taking off the gloves, now.

This is getting overturned. This is an inferior court, and I'll invite the news media. They need to see this modern-day lynching, yeah.

[Court]: I haven't seen any motions. There aren't any motions that have been filed --
[Dean]: Your Honor --
[Court]: -- with the Court at this point in time.
[Dean]: Your Honor, I thought I told you --
[Court]: All right. We're finished[.] [W]e'll see you on the 14th.

The district court held another pretrial hearing on August 11, 2023. The bill of exceptions for that proceeding is not in our record because Dean did not specifically request it for this appeal. However, the judge's notes for that hearing, which are part of the record, state, "[Dean] engage[d] in commentary once again regarding this matter being filed against a trust. Following [a] colloquy with [Dean] regarding the charges, possible consequences, and scope of his self-representation, the court terminates [his] self-representation and appoints [substitute standby counsel] as counsel for defendant." We will refer to this attorney as Dean's trial counsel.

We note here that the judge's notes also indicate that Dean's trial counsel made an oral motion for a competency evaluation of Dean at the August 11, 2023, hearing, which the district court sustained. Dean's competency evaluation was conducted on August 24. In the written evaluation, the forensic psychiatrist stated:

No unusual mannerisms, tics, or compulsions are noted. [Dean] is friendly and cooperative. [His] [a]ttention span and concentration are adequate. He is quite verbal and can express himself well. His fund of information is deemed good. He has no looseness of associations or pressured speech. He is not depressed, and no significant anxiety is noted. He is oriented in all spheres[,] and [his] memory is good for recent and distant events. He is not subject to internal stimuli, i.e., hallucinations[,] and no delusional thoughts are evident. His judgment and insight are deemed good.

This man does not want to be punished unjustly. He has good contact with reality and the minimum level of intelligence necessary to grasp events taking place. He can confer coherently with [an] appreciation of proceedings and both give and receive advice from his attorney in [an] effort to muster a rational defense and select a sensible plea. He can testify on his own behalf if that were desirable. He is able to withstand the stresses of trial without a breakdown of his rationality or judgment and can follow testimony reasonably well. While he plans to represent himself, he has established rapport with his supporting attorney. [Dean] can answer questions posed. He has [quite a] good understanding of the functions of the several court officers and of court proceedings in general.

The psychiatrist ultimately concluded that Dean "understands that he is in a court of law charged with criminal offenses" and that, "to a reasonable degree of medical certainty, he has the capacity to stand trial."

On September 29, 2023, the issue of Dean's competency was taken up by the district court. The forensic psychiatrist's evaluation was received as exhibit 1. Based on that report, the court found Dean competent to stand trial. Trial counsel subsequently indicated that Dean once again sought to waive his right to counsel and to represent himself. Trial counsel indicated that Dean was "well-versed in the law" and trial procedures but acknowledged that Dean's "behavior in court may be a concern to the [c]ourt, and . . . may be an inconvenience to the [c]ourt, but [counsel did not] know that that trumps his right to represent himself." The court denied Dean's motion, stating that while it found Dean to be competent to stand trial, "the query does not end there." It explained,

In order to find that Mr. Dean can represent himself, which I revoked that right previously, and I did so based on the finding that I made that there could not possibly be a voluntary, intelligent, and knowing waiver of counsel when Mr. Dean, in the body of the record of this case, has refused to acknowledge that there is not a trust being sued here for something, and not understanding who he represents.

Trial counsel then informed the district court that Dean had instructed him to file a motion for discharge, which trial counsel had prepared but not yet filed. Dean interrupted to say the motion was filed because he had "made certain of it." The court told Dean to "stop talking." Dean claimed he was talking to his attorney and that he had "to do what I say, not just take over." Trial counsel indicated that Dean may have filed something, but that trial counsel had not. Dean interrupted the court again, saying that he wanted to make an oral motion. The court reminded Dean that he did not get to make any motions; rather, he had to talk to his trial counsel. The court then asked trial counsel if he wanted to take up an oral motion for discharge, which trial counsel responded that he did not. Dean stated that he wanted to "voluntarily, intelligently waive my right to counsel."

The court responded that it would only listen to trial counsel. Dean claimed that trial counsel "refuses to listen to me and make this motion." The court had Dean removed from the courtroom at that time.

A jury trial took place from October 2 to October 4, 2023. However, the bill of exceptions before us only contains the pretrial proceedings, the first day of trial, and the October 4 reading of the jury verdicts on the three crimes charged, the polling of the jurors, and the district court's acceptance of the verdicts. The judge's notes indicate that there were additional witnesses who testified on October 3 and 4, including Dean himself. However, Dean's request for a bill of exceptions only requested "10/2/2023 Jury trial and verdict." Regardless, the omission of the remainder of the jury trial is not necessary to the resolution of the issues raised on appeal. The jury found Dean guilty of all three charges. Thereafter, the district court ordered a presentence investigation report (PSR).

Sentencing took place on January 18, 2024. Dean was sentenced to 6 to 10 years' imprisonment for each felony conviction (assault in the second degree and use of a deadly weapon to commit a felony), and 1 year of imprisonment for the misdemeanor conviction (child abuse). All sentences were ordered to run consecutively to each other and any other sentence being served by Dean. He was not given any credit for time served. Dean's trial counsel renewed his motion to withdraw because Dean did not want counsel to represent him further. Trial counsel informed the district court that Dean understood his right to appeal and indicated that he would forward Dean a copy of the sentencing order as soon as it was received. Because "[t]hese proceedings are concluded," the court sustained trial counsel's motion to withdraw.

Dean appealed pro se, but subsequently requested the appointment of appellate counsel, which was granted.

ASSIGNMENTS OF ERROR

In the brief filed by Dean's appellate counsel, Dean assigns that the district court erred in (1) denying his right to waive counsel and represent himself at trial and (2) imposing an excessive sentence. We do not address the errors assigned in an initial pro se brief filed by Dean for the reasons explained below.

STANDARD OF REVIEW

The question of competency to represent oneself at trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a clearly erroneous standard of review. *Id*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

## ANALYSIS

### INITIAL PRO SE BRIEF

Dean, while no longer represented by counsel, timely filed his appeal on February 8, 2024. On July 12, he filed a motion for the appointment of appellate counsel. Prior to the district court's ruling on his motion, he filed a pro se brief on July 16. His pro se brief contained 25 assignments of error. They alleged: the district court did not have subject matter jurisdiction "over the matter" or personal jurisdiction over him; there was no proper service of process, no "Grand Jury indictment," and no sworn affidavit from an "injured party"; the court "miss identified [sic] the defendant, Ens legis, artificial entity, in case CR23-464, from the Natural flesh and blood person"; the court "violated its Oath, when it lied on the record about the charging information being in all capitol [sic] letters when asked"; the court "breach[ed] its fiduciary duties," "practice[ed] Law from the bench," and failed to "rebut [Dean's] assertion that it is an artificial entity"; the court "failed or refused to correct the charging information," "overruled a motion to dismiss," denied him "the right to have counsel of his choice," and denied him his "right to represent one's self/intrest [sic]"; the court failed to investigate "a crime commited [sic] by other public official"; the court allowed "the jury to be prejudice[d] by prior convictions at trial," allowed "testimony from a witness who was not properly sworn in under Oath," allowed "illegal search and seizures," "ignored evidence in the record of extortion" by public officials, and "failed to produce any sign[ed] Contract that [Dean] . . . [was] under the jurisdiction of a[n] admiralty Court"; his right to a speedy trial was violated; the court erred by "not producing a complete unredacted certified Bill of Exception when order[ed] by the Supreme Court to do so"; the court failed to recuse the judge "for having a conflict of intrests [sic]"; and the court "failed to Adjudicate and identify the Rights of the contending parties now by identifying what were, in law, the rights and wrongs, or validity or invalidity, of their actions and transactions when entered upon and done" in violation of the federal and state Constitutions.

We note here that in *State v. Hessler*, 274 Neb. 478, 741 N.W.2d 406 (2007), the Nebraska Supreme Court was faced with a similar situation where a pro se appellant filed an initial brief. The Supreme Court ordered a replacement brief, but the pro se appellant informed the court that he did not file or want the appeal and would not file any more briefs. The Supreme Court ordered the appointment of counsel to represent the appellant; appointed counsel subsequently filed a brief assigning various errors. The Supreme Court did not address the pro se brief but instead responded to the brief filed by appointed counsel. See *id*.

In the present case, Dean filed a motion with the district court seeking the appointment of appellate counsel. Because no order had been entered in response, the State filed a motion with this court to seek action on Dean's pending motion. On July 25, 2024, we sustained the State's motion and directed the district court to rule on Dean's motion for the appointment of counsel. That same day, Dean filed with this court a response to the State's motion. Dean asserted that (1) "The Authorized representative/Attorney in fact is proceeding, pro-persona, Sui Juris, Legalis homo, NoT pro se" and (2) "is proceeding on behalf of the Appellant, ENS Legis, artificial entity"; (3) "[t]hat any counsel to make an appearance is to understand it is representing the ENS Legis, artificial entity, JARON DEAN, not the private person, in his private capacity, JaRon:Dean, The Aut[h]orized representative/Attorney in fact"; (4) appointed counsel was to "submit a

- 9 -

supplemental brief <u>only</u>! Not an amended brief"; (5) "any supplemental brief" must be approved by Dean's "Authorized representative/Attorney in fact, JaRon:Dean, pro personal, Sui Juris, Legalis homo with his ink signature, before submitting to the Court of Appeals"; and (6) the "only issues to be supplemented on behalf of the appellant, ens Legis, artificial entity would be ineffective assistance of Trial Counsel."

On July 30, 2024, the district court appointed Dean's initial standby attorney as appellate counsel. On August 26, Dean filed an "Objection of Appointment of Counsel." He asked this court to direct the district court "to issue an order of appointment of counsel to the defendant/appellant JARON DEAN, which is a legislative contemplation in law, and not it's [sic] Authorized representative/attorney in fact, JaRon:Dean, the private person." On September 20, Dean's appellate counsel filed a "Motion for Leave to File Supplemental Brief," seeking to "raise additional issues on appeal, not raised or adequately briefed in the pro se brief filed by [Dean]." In response, this court entered an order on September 27, which stated, "Motion of Appellant to file replacement brief sustained. Brief due on or before October 18, 2024. Appellee brief due 30 days from receipt of Appellant's replacement brief." On October 18, Dean's appellate counsel filed a "Supplemental Brief of Appellant."

Neb. Ct. R. App. P. § 2-101(F)(6) (rev. 2022) provides that "[o]nce counsel is appointed by any court . . . , all filings with the appellate court shall be through counsel, unless the court permits otherwise." Further, "[a]ny documents or communications submitted to the appellate court by a party who has counsel may be (a) returned unfiled to the sending party or (b) forwarded unfiled to the sending party's counsel." *Id.* Although Dean filed his pro se brief prior to the district court appointing appellate counsel, once appellate counsel entered an appearance in this appeal and requested to file a "supplemental brief," this court directed appellate counsel to file a "replacement brief." It is significant that this court ordered a replacement brief rather than a supplemental brief. Notably, Neb. Ct. R. App. P. § 2-109(F) (rev. 2024) provides that "[i]f a court orders a party to submit a replacement brief for failure to comply with [the] requirements of [§ 2-109], the original brief shall be stricken upon filing of the replacement brief." In this case, although we did not indicate that Dean's pro se brief failed to comply with § 2-109, when appellate counsel was appointed to represent Dean per his request, we nevertheless specifically ordered the filing of a replacement brief, not a supplemental brief. This directive was intended to avoid having two briefs filed by the appellant, one filed by Dean pro se and one filed by Dean's appointed appellate counsel. Section 2-101(F)(6), set forth above, is designed to limit appellate court filings to those filed by counsel when a party is represented by counsel. Once appellate counsel was appointed and sought to file a brief on behalf of appellant, this court ordered the submission of a replacement brief. Although appellate counsel filed a brief titled "Supplemental Brief of Appellant," we find its title of no consequence. Because this court ordered a replacement brief, we will construe the "Supplemental Brief of Appellant" as a replacement brief and will refer to it as such in this opinion. Further, because a replacement brief was ordered, the initial pro se brief is stricken pursuant to § 2-109(F).

We therefore consider only the two errors assigned in the brief submitted by Dean's appellate counsel and not the 25 errors assigned in Dean's initial pro se brief. To proceed otherwise would disregard a prior order of this court, which we decline to do. Further, it would defeat the

purpose of § 2-101(F)(6), which seeks to limit filings in the appellate courts to those filed by counsel when a party has retained or been appointed an attorney.

RIGHT TO WAIVE COUNSEL

Dean's first assigned error asserts that the district court erred in denying his "right to waive counsel and represent himself at trial." Replacement brief for appellant at 5. He argues that "it is clear that the trial judge was increasingly annoyed with [him] for voicing his various legal theories which she found to be unpersuasive. However, annoyance is not a sufficient reason for denying a defendant his constitutional rights." *Id.* at 9. The State responds that Dean cannot show that the court "clearly erred in finding that Dean had failed to knowingly, voluntarily, and intelligently waive his right to counsel." Brief for appellee at 18. For the reasons that follow, we agree with the State.

A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019). The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding. *Id.*

The district court found Dean competent to stand trial. Thus, the court necessarily concluded, based on the evaluation received from the forensic psychiatrist, that Dean understood the proceedings against him and had a sufficient ability to consult with his lawyer with a reasonable degree of rational understanding. That determination is not at issue in this appeal. Rather, at issue is whether Dean could competently waive his right to counsel and whether such a waiver could be made knowingly, intelligently, and voluntarily.

A criminal defendant has a constitutional right to waive the assistance of counsel and conduct his or her own defense under the Sixth Amendment and Neb. Const. art. I, § 11. *State v. Jenkins, supra.* However, a criminal defendant's right to conduct his or her own defense is not violated when the court determines that a defendant competent to stand trial nevertheless suffers from severe mental illness to the point where he or she is not competent to conduct trial proceedings without counsel. *Id.* The two-part inquiry into whether a court should accept a defendant's waiver of counsel is, first, a determination that the defendant is competent to waive counsel and, second, a determination that the waiver is knowing, intelligent, and voluntary. *Id.*

The standard for determining whether a defendant is competent to waive counsel is the same as the standard for determining whether a defendant is competent to stand trial. See *Jenkins, supra.* The Nebraska Supreme Court has stated:

> We are mindful that the competency question is not whether a defendant can ably represent himself or herself. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." Indeed, "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation."

*Id.* at 693-94, 931 N.W.2d at 869 (quoting *Godinez v. Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (emphasis in original)). As indicated in *Jenkins*, if sufficient evidence supports the trial court's determination that a defendant is competent to stand trial, then the defendant is competent to waive his right to counsel. The evidence in the record before us supports the district court's determination regarding Dean's competency to stand trial. It therefore also supports his competency to waive his right to counsel.

That takes us to the second consideration. In order to waive the constitutional right to counsel, the waiver must be made knowingly, voluntarily, and intelligently. *State v. Jenkins, supra*. When a criminal defendant has waived the right to counsel, an appellate court reviews the record to determine whether under the totality of the circumstances, the defendant was sufficiently aware of his or her right to counsel and the possible consequences of his or her decision to forgo the aid of counsel. See *id*. Here, the district court concluded that Dean could not knowingly, voluntarily, and intelligently waive his right to counsel. The hearing on August 11, 2023, during which the district court terminated Dean's self-representation, is not included in the bill of exceptions because Dean did not timely request it for this appeal. Therefore, our review is limited to the judge's notes from that hearing, as well as the discussion regarding Dean's renewed request to waive counsel that took place on September 29. It is well settled that it is an appellant's responsibility to present a record which supports the error assigned. See *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). Regardless, we find the record sufficient to address this assigned error.

The district court judge's notes from the August 11, 2023, hearing stated that "[Dean] engage[d] in commentary once again regarding this matter being filed against a trust. Following [a] colloquy with [Dean] regarding the charges, possible consequences, and scope of his self-representation, the court terminates [his] self-representation and appoints [substitute standby counsel] as counsel for defendant." Also, at the September 29 hearing, the court reiterated its earlier determination that "there could not possibly be a voluntary, intelligent, and knowing waiver of counsel when Mr. Dean . . . has refused to acknowledge that there is not a trust being sued here for something, and not understanding who he represents."

The district court's conclusion is supported by the record, as evidenced in part by the colloquies set forth earlier in this opinion. At multiple hearings, Dean asserted that the case was not against him as an individual but rather against a trust, despite being repeatedly informed that it was a criminal matter against him. At the August 1, 2023, pretrial hearing, Dean stated that he "just found out" the case was criminal, not civil. Nonetheless, he continued to make arguments regarding the trust and subject matter jurisdiction. He asserted that he needed to sign a contract in order for the court to have jurisdiction over him because they were under "admiralty law" and that the court was treating him like a "slave." These arguments, while perhaps meaningful to Dean, support the court's concern that while Dean was competent to stand trial based upon the forensic psychiatrist's evaluation, his request to waive counsel could not be made knowingly, intelligently, and voluntarily. Under the totality of the circumstances, it was not clearly erroneous for the court to determine that Dean was not sufficiently aware of the possible consequences of his decision to forgo the aid of counsel.

Further, Dean's persistent interruptions of the district court support its decision to terminate his self-representation. The right to self-representation is not absolute, and a "trial judge may

terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." See *State v. Lewis*, 280 Neb. 246, 785 N.W.2d 834 (2010) (quoting *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). In *Lewis, supra*, the Nebraska Supreme Court determined that the defendant's history of disruptive behavior justified denying his request to represent himself. In that case, the record showed multiple instances where the defendant was removed from the courtroom for his conduct, which included "interrupting the court, refusing to follow courtroom procedure, and using abusive language." *Id.* at 255, 785 N.W.2d at 841. The court also noted that at a hearing, court staff informed the judge that if the defendant's presence were required, "they would need to get another four or five officers to transport him into the courtroom." *Id.*

Dean's behavior was less extreme than the defendant's behavior in *Lewis, supra*. However, as illustrated in the colloquies and hearing summaries set forth above, Dean repeatedly interrupted the district court despite being asked to stop. He also used abusive language. For example, at the August 1, 2023, pretrial hearing, he stated, "Who the fuck [does the prosecutor] think she's fucking with? I'll show her. Taking off the gloves, now."

For these reasons, we cannot say that the district court was clearly erroneous in denying Dean's request to waive his right to counsel.

EXCESSIVE SENTENCE

The district court entered an order on January 18, 2024, sentencing Dean as follows. He was sentenced to 6 to 10 years' imprisonment for assault in the second degree, a Class IIA felony, which is punishable by up to 20 years' imprisonment. See Neb. Rev. Stat. §§ 28-309 and 28-105(1) (Cum. Supp. 2024). He was sentenced to 6 to 10 years' imprisonment for use of a deadly weapon to commit a felony, a Class II felony, which is punishable by 1 to 50 years' imprisonment. See §§ 28-1205(1)(b) and 28-105(1). Dean was sentenced to 1 year of imprisonment for child abuse, a Class I misdemeanor, which is punishable by up to 1 year of imprisonment. See Neb. Rev. Stat. §§ 28-707(3) and 28-106(1) (Reissue 2016).

Dean assigns as error that the district court imposed "an excessive sentence." Replacement brief for appellant at 5. There is no question that his sentences are within the statutory limits. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). For a defendant who has been sentenced consecutively for two or more crimes, we generally consider

the aggregate sentence to determine if it is excessive. *Id.* In this case, a sentence for a conviction under § 28-1205(1) must be consecutive to any other sentence imposed. See § 28-1205(4).

Dean refused to participate in the presentence investigation interview. His PSR consists primarily of police reports. Nonetheless, it reveals the following information. Dean did not complete high school and did not obtain a GED. His criminal history includes convictions for disturbing the peace, resisting arrest, and possession of drug paraphernalia prior to 1993. In 1993, he was convicted of murder in the second degree and use of a firearm to commit a felony. He was sentenced to 25 years' to life imprisonment. He was placed on discretionary parole in July 2022 and was on parole at the time of his current offenses. This led to his parole being revoked in October 2023. Notably, he committed his current offenses less than a year after he was released on discretionary parole.

As for Dean's current convictions, he was 51 years old at the time of the incident in February 2023. During that incident, Dean dragged his 9-year-old son across the yard in the winter in the early morning hours. JuMauni was still in his pajamas and was not wearing a coat, shoes, or socks. While Dionne tried to free JuMauni from Dean's grip, Dean repeatedly assaulted her in front of their son. Dean struck Dionne on the head with a hammer, causing severe injuries.

Dean did not show any remorse at sentencing. Although he personally made comments to the district court, he failed to address his current convictions and instead provided a lengthy narrative with many of the same nonsensical arguments he had presented during the pretrial hearings, as set forth earlier in this opinion. The State reminded the court that this was a "violent act," and asked the court to consider the impact on the victim and her family.

On appeal, Dean argues that the district court failed to "adequately consider most of the sentencing factors" and that "it focus[ed] primarily on the crime itself without considering other circumstances." Replacement brief for appellant at 9. He asserts that the court "did not mention [his] age, education and experience, or social and cultural background." *Id*. He further argues that the court "failed to consider the circumstances under which the assault took place." *Id*. He claims that Dionne was "attacking him" and it was "at that point that he grabbed the hammer and began hitting her." *Id*. However, there is no evidence that the district court failed to consider the relevant sentencing factors. At sentencing, the court stated that it "reviewed the presentence report" and "sat through all of the proceedings, including the trial in this matter." It further stated:

> Having regard for the nature and circumstances of these crimes and Mr. Dean's history, character, and condition, I do find that imprisonment is necessary for the protection of the public.
>
> I find that the risk is substantial, during any period of probation, he would engage in additional criminal conduct; and I find that lesser sentences than I will impose here today would, in fact, depreciate the seriousness of these crimes and promote disrespect for the law.

We further observe that Dean received a sentence at the lower end of the statutory range for his two felony convictions. While he could have received a sentence of up to 20 years' imprisonment for assault in the second degree and up to 50 years' imprisonment for use of a deadly weapon to commit a felony, he was only sentenced to 6 to 10 years' imprisonment for each felony

conviction. Considering the record before us, we cannot say that the district court abused its discretion in the sentences imposed in this matter.

## CONCLUSION

For the foregoing reasons, we affirm Dean's convictions and the district court's January 18, 2024, sentencing order.

AFFIRMED.